838 F.2d 1576
 1988 A.M.C. 2328
 STATE ESTABLISHMENT FOR AGRICULTURAL PRODUCT TRADING,
Plaintiff-Appellant,
v.
M/V WESERMUNDE, Her engines, tackle, apparel, furnishings,
etc.; in rem: Marquis Compania Naviera, S.A.; The United
Kingdom Mutual Steamship Assurance Association (Bermuda)
Limited; Pateras Brothers, Ltd.; Pateras Investments,
S.A.; and Kittiwake Compania Naviera, S.A., in personam,
Defendants-Appellees.
 No. 87-3375.
 United States Court of Appeals,
Eleventh Circuit.
 March 11, 1988.
 
 David G. Hanlon, Shackleford, Farrior, Stallings & Evans, Tampa, Fla., for plaintiff-appellant.
 Allen Von Spiegelfeld, Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, Fla., for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before VANCE and HATCHETT, Circuit Judges, and OWENS,* Chief District Judge.
 OWENS, Chief District Judge:
 In this latest appeal from a decision of the United States District Court for the Middle District of Florida, appellant, State Establishment For Agricultural Product Trading (hereinafter State Establishment), seeks to have this court reverse the decision of the district court that: (1) required it to arbitrate its dispute in London, England, and (2) stayed any further proceedings in the district court until that arbitration proceeding had been completed. State Establishment refused to comply with this order compelling arbitration, and as a result of its noncompliance, State Establishment now finds itself in the posture of having its case dismissed with prejudice for want of prosecution. The issue before this court is whether the district court erred in ordering arbitration in this case, and, if so, whether it was an abuse of discretion to dismiss State Establishment's case with prejudice for failure to comply with that arbitration order. Because we find that the district court did err in requiring arbitration, and further, that there was available to the district court a less severe sanction other than outright dismissal with prejudice of State Establishment's claims, the court VACATES the district court's order dismissing State Establishment's action and REMANDS the case for further proceedings consistent with this opinion.
 Background
 On May 4, 1983, State Establishment instituted a multi-million dollar suit for damages arising out of the loss of a cargo of 82,073 cases of fresh eggs laden on board the M.V. Wesermunde in Tampa, Florida, for delivery to Aqaba, Jordan. Apparently before the eggs could be off-loaded in Aqaba, Jordan, they were destroyed by fire. Named in State Establishment's complaint as defendants were the M.V. Wesermunde, the vessel of foreign registry that carried the cargo of eggs to Aqaba, Jordan; Marquis Compania Naviera, S.A., and Kittiwake Compania Naviera, S.A., corporations engaged in the common carriage of cargo by sea; Pateras Brothers, Ltd. and Pateras Investment, S.A., corporations engaged in the management of ocean-going vessels including the M.V. Wesermunde; and the United Kingdom Mutual Steamship Assurance Association (Bermuda) Ltd. (U.K. Club), the liability underwriter for these defendants. State Establishment, owner of the cargo of eggs, is an agency of the government of Iraq incorporated and organized under the laws of that country.
 U.K. Club, liability underwriter of the M.V. Wesermunde and for all of the named defendants, initially filed a motion to dismiss the complaint against it on the ground that State Establishment did not have a direct action under Florida law against a marine insurer. The district court granted U.K. Club's motion on December 20, 1983, and State Establishment took an appeal from this decision. We found, however, that our ruling in Steelmet Inc. v. Caribe Towing Corp., 779 F.2d 1485 (11th Cir.1986), was contrary to the district court's position and controlling under the facts of the case. We, therefore, reversed the decision of the district court and reinstated U.K. Club as a party to State Establishment's action. See State Establishment For Agricultural Product Trading v. M.V. Wesermunde, 785 F.2d 1035 (11th Cir.1986).
 While this "direct action" issue concerning U.K. Club was still on appeal, the remaining defendants moved to have the underlying dispute between them and State Establishment referred to arbitration in London, England. These defendant supported their demand for arbitration by showing that on December 18, 1981, defendant Marquis Compania Naviera, S.A., the owner of the M.V. Wesermunde, entered into a charter party agreement with Murray Clayton Limited as charterer. A "charter party" is a specialized type of maritime contract for the hire of a vessel. The person who obtains the use and service of the ship is called the charterer, and the person hiring out the vessel is usually the shipowner. See Thomas J. Schoenbaum, Admiralty and Maritime Law, Section 10-1 at p. 381 (1987). Included in paragraph 34 of this charter party agreement was the language that "[a]ny dispute arising under this charter party to be settled by arbitration in London (not lawyers) according to the Arbitration Act." Defendants further showed that the bills of lading under which State Establishment was to have its cargo of eggs shipped contained the following language:
 All the terms, conditions, liberties, and exceptions of the Charter-Party are herewith incorporated. AS PER CHARTER PARTY DATED DECEMBER 18TH, 1981.
 Defendants additionally moved to stay the action before the district court during the pendency of any court ordered arbitration proceeding, pursuant to 9 U.S.C. Secs. 2 and 3 (1970). In response to that motion, State Establishment argued that it was not bound by the terms of the charter party since it was not a signatory to the charter party, nor did the dispute arise from the charter party agreement. It also argued that there was never any contractual agreement between the parties to arbitrate their disputes, and without such an agreement, there was no basis to order arbitration. See AT & T Technologies v. Communications Workers, 475 U.S. 643, 647, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648, 655 (1986). After reviewing the documents submitted by defendants in support of their motion, however, the district court ruled that the bill of lading given to State Establishment effectively incorporated by reference the arbitration clause found in the charter party, ordered arbitration, and stayed the proceedings before the district court.
 Eager to have this ruling reversed, State Establishment filed a second appeal to this court. We found, however, in State Establishment for Agricultural Product Trading v. M.V. Wesermunde, 770 F.2d 987, 989 (11th Cir.1985), that the appeal was premature due to an antiquated, but still viable, admiralty law doctrine. This doctrine, as stated in Schoenamsgruber v. Hamburg American Line, 294 U.S. 454, 55 S.Ct. 475, 79 L.Ed. 989 (1935), provides that while proceeding in admiralty, an order compelling arbitration and staying the action pending arbitration pursuant to 9 U.S.C. Secs. 1-14 is:
 (1) not a final order under 28 U.S.C. Sec. 225 (now Sec. 1291);
 (2) not an injunction under 28 U.S.C. Sec. 227 (now Sec. 1292(a)(1)); and,
 (3) not an appealable interlocutory decree under the present Sec. 1292(a)(3).
 770 F.2d at 989. We, therefore, concluded that the court lacked jurisdiction to hear the appeal, and consequently dismissed it.
 Frustrated that the district court's arbitration decision could not be appealed as a matter of right, State Establishment next proceeded to request the district court to reconsider its stay order, and, if it should refuse to do so, moved in the alternative to have the district court certify the question for immediate appeal, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. Both of these motions were denied.
 Following the denial of these motions, State Establishment remained unable or unwilling to go to arbitration in London, England. All defendants except U.K. Club, which had just been reinstated as a party, then presented the district court with a motion to dismiss State Establishment's case. These defendants asserted that State Establishment's willful refusal to comply with the district court's order compelling arbitration constituted sufficient grounds to dismiss the complaint. The district court ordered State Establishment to show cause why its claims should not be dismissed for want of prosecution, and in response to this show cause order, State Establishment argued that the arbitration order was erroneous, and that if the district court would not reconsider its earlier decision, then it prayed for an order of dismissal with prejudice so that the arbitration issue could finally be resolved by the Court of Appeals. At oral argument, State Establishment further explained its refusal to arbitrate by stating that when the district court refused to reconsider its arbitration order, and also refused to certify the question for an immediate appeal, State Establishment was placed in, what it considered to be, a "Catch 22" position--State Establishment was now required to expend substantial time, effort, and funds to comply with a likely erroneous arbitration order, yet because of the Schoenamsgruber doctrine, it was necessary to complete the arbitration process before the validity of the arbitration proceeding could be tested on appeal. Faced with this dilemma, State Establishment believed that it was better to forego any damages it might potentially be able to recover from the arbitration process for the chance that the district court erred in ordering arbitration, that we would reverse this decision, and that ultimately, we would allow its claims to be tried before the district court. The inherent risk in taking such a position was, of course, that if the district court was correct in ordering arbitration, the dismissal with prejudice for failure to comply with that order would be affirmed by this court. Fortunately for State Establishment, however, under the facts presented to the district court, we are troubled with the lower court's order requiring the parties to arbitrate their dispute in London, England.
 Propriety of Ordering Arbitration
 In making its decision that the bill of lading given to State Establishment effectively incorporated by reference the arbitration clause found in the charter party, this court believes that the district court failed to give sufficient weight to other language in the bills of lading that incorporated by reference the provisions of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. Secs. 1300-1315, (1975), and the body of case law interpreting that Act. Conforming to the typical bill of lading utilized by most carriers engaged in transporting cargo by sea, the provisions of COGSA were incorporated by reference into the bills of lading given to State Establishment.[1] The body of case law applying COGSA's provisions are thus made applicable to the bill of lading contract. COGSA does not apply, however, ex proprio vigore. At oral argument State Establishment represented to the court that it believed that its cargo of eggs constituted the entire cargo aboard the M.V. Wesermunde during its fateful voyage from Tampa, Florida, to Aqaba, Jordan. Under these facts, a private contract of carriage was created and COGSA's protections would not apply on their own force. Defendants need not have, therefore, complied with COGSA's provisions. See Schoenbaum, Admiralty and Maritime Law, section 9-11, at 307-08. Nevertheless, by specifically adopting COGSA's provisions into the bills of lading, COGSA applies to these parties as a matter of contract. COGSA's protections must be afforded to State Establishment, then, unless there was an express agreement by the parties that a contrary result was intended.
 Before the court need address the issue of whether there was an express agreement to waive certain rights under COGSA, however, we must first determine whether any of COGSA's provisions would bar the enforcement of the foreign arbitration clause found in the charter party. In order to answer this question the court finds enlightening the legislative history of COGSA. COGSA represents the American enactment of the Hague Rules, developed at a series of international maritime conferences in the 1920's. It was promulgated as part of an international effort to achieve uniformity and simplification of bills of lading used in international trade. See Robert C. Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297, 301, 79 S.Ct. 766, 769, 3 L.Ed.2d 820, 823 (1959). COGSA was also intended to reduce uncertainty concerning the responsibilities and liabilities of carriers, the responsibilities and rights of shippers, and the liabilities of underwriters who insure waterborne cargo. By strictly circumscribing the ability of carriers to avoid liability on cargoes in their care, COGSA also greatly enhances the negotiability of bills of lading. See Wirth Ltd. v. S.S. Acadia Forest, 537 F.2d 1272, 1276-79 (5th Cir.1976); and Portland Fish Co. v. States Steamship Co., 510 F.2d 628, 631-33 (9th Cir.1974); see generally, Schoenbaum, Admiralty and Maritime Law, section 9-13, at 314-15.
 Of most relevance to the issue at bar is the statute's power to void overreaching clauses inserted by carriers in their bills of lading that unreasonably limit the carrier's liability or obstructs the freight claimant's ability to secure redress. See Encyclopedia Britannica, Inc. v. S.S. Hong Kong Producer, 422 F.2d 7, 11-12 (2d Cir.1969), cert. denied, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970). In providing this latter protection, courts have found contractual language requiring a consignee to litigate claims against the carrier in a foreign forum under foreign law to be ineffective because such provisions, as a practical matter, tend to lessen the liability of the carrier, particularly where the claim is small. See Indussa Corp. v. S.S. Ranborg, 377 F.2d 200, 203-04 (2d Cir.1967); and G. Gilmore & C. Black, The Law of Admiralty, Secs. 3-25 at 145 n. 23 (2d ed. 1975) (such a clause puts a high hurdle in the way of enforcing liability and thus is an effective means for carriers to secure settlements lower than if cargo could sue in a convenient forum). While we do not believe that arbitration in and of itself is per se violative of COGSA's provisions, especially in light of Congress' encouragement of arbitration by its enactment of the Arbitration Act, 9 U.S.C. Secs. 1-14 (1970)[2] the court does believe that a provision requiring arbitration in a foreign country that has no connection with either the performance of the bill of lading contract or the making of the bill of lading contract is a provision that would conflict with COGSA's general purpose of not allowing carriers to lessen their risk of liability.
 The facts presented to the district court on this issue were that the only party related to the English forum was the charterer, Murray Clayton Ltd., who was not a named defendant in State Establishment's action. The bills of lading were entered into in Tampa, Florida. The final negotiation of the bills of lading took place in Tampa, Florida. The bills of lading were to be performed in Tampa, Florida, Aqaba, Jordan, and all ports in between. The cargo was loaded in Tampa, Florida, and finally, defendants' domicile, residence, nationality, place of incorporation, and place of business are located in Panama, the Bahamas, and Greece; whereas State Establishment's domicile is in Iraq. These facts lead this court to believe that enforcement of the arbitration clause found in the charter party would have the effect in this case of lessening the liability of the carrier. Accordingly, if COGSA applied ex proprio vigore, the provision requiring arbitration in London, England, would have been void and utterly without effect. See 46 U.S.C. Sec. 1303(8).
 Even if the provision requiring arbitration in London, England did not per se conflict with COGSA's requirement that no provisions may lessen the shipowner's liability below that of the statutory minimum, the court considers the language requiring foreign arbitration in this case to, at least, arguably conflict with COGSA's implied policy that an American forum will be made available to a consignee when a bill of lading is issued subject to the terms of that Act. We have held that where such an arguable conflict exists, at minimum, the consignee must be given actual notice of the conflicting provision before entering into the contract in order to have that provision enforced. In the first of our decisions on this subject, we held in Allstate Insurance Co. v. International Shipping Corp, 703 F.2d 497 (11th Cir.1983), that the applicable statute of limitations in the case could not be modified by a provision found in a long form bill of lading, where that provision was incorporated by reference into the short form bill of lading, the language was never specifically brought to the consignee's attention, the consignee did not have actual knowledge of the provision in the long form bill of lading, and the provision arguably conflicted with the absence of a specific limitations period under the Harter Act. Id. at 500. This decision was reaffirmed in Swift Textiles, Inc. v. Watkins Motor Lines, Inc., 799 F.2d 697 (11th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1577, 94 L.Ed.2d 768 (1987), wherein we found that while not prepared to strike down all tariff provisions of which a shipper has no actual notice, in order to insure a reasonable result and to prevent injustice, it is proper to require that a shipper be given actual notice of a provision that arguably conflicts with the protections afforded him under certain federal Acts, such as COGSA and the Harter Act, where those Acts are traditionally incorporated by reference into all bills of lading. Id. at 703-04. We, thus, hold in this case that absent actual notice to State Establishment of the foreign arbitration clause found in the charter party, COGSA and the case law interpreting that act would have barred defendants from invoking the language requiring arbitration.
 It is this court's conclusion, then, that COGSA would either bar per se the enforcement of the instant arbitration clause or the provision would be ineffective unless actual notice of it was given to State Establishment when it signed the bills of lading. By adopting COGSA contractually into the bills of lading, these protections should be afforded State Establishment unless there was an express agreement by the parties that a contrary result was intended. In reviewing the evidence before the district court, we are simply unpersuaded that the incorporation by reference language in the bills of lading constitutes an express agreement by these parties that State Establishment would give up its right under COGSA to demand an American forum for any potential claims that might later arise in favor of an arbitration proceeding to be held in a London, England forum. There is no evidence that the terms of the bills of lading in this case were agreed to through hard bargaining; rather they appear to be the form clauses of an adhesion contract. See Union Insurance Society of Canton, Ltd. v. S.S. Elikon, 642 F.2d 721, 724 (4th Cir.1981); and 6A A. Corbin, Contracts Sec. 1376, at 21-22 n. 17 (1962). No reference is made to arbitration in the bills of lading. Nothing alerts State Establishment's attention to the possibility that the reference to the charter party may be a "booby trap," and, of course, there is no evidence that State Establishment was provided with a copy of the charter party. See Siderius, Inc. v. M.V. Ida Prima, 613 F.Supp. 916 (D.C.N.Y.1985). State Establishment was, however, provided with actual notice on the face of the bills of lading that COGSA's provisions would be made applicable to the contract of carriage. These facts lead us to conclude that: (1) State Establishment was not given actual notice of the arbitration provision in the charter party; (2) the parties never expressly agreed to have any disputes arising out of the bills of lading litigated first in a foreign arbitration proceeding; and (3) that COGSA's protections were expressly agreed to by the parties in the bills of lading. The district court's order that required State Establishment to first arbitrate its claims against the named defendants in London, England, therefore, was erroneous. Because the district court erred in this regard, we must now consider whether the district court also erred when it dismissed State Establishment's case with prejudice for want of prosecution.
 Abuse of Discretion
 The decision to dismiss for want of prosecution lies within the trial court's discretion and can be reversed only for an abuse of discretion. See McKelvey v. AT & T Technologies, Inc., 789 F.2d 1518, 1520 (11th Cir.1986); and Martin-Trigona v. Morris, 627 F.2d 680, 682 (5th Cir.1980). The severe sanction of dismissal with prejudice, however, can be imposed "only in the face of a clear record of delay or contumacious conduct by the plaintiff." Id. at 682. Furthermore, our decisions make clear that such a dismissal is a sanction of last resort, applicable only in extreme circumstances, and generally proper only where less drastic sanctions are unavailable. See McKelvey, 789 F.2d at 1520; and Searock v. Stripling, 736 F.2d 650, 653 (11th Cir.1984). Finally, we must find that the sanction was supported by a record of willful delay, as opposed to a mere showing of negligence on the part of the party being sanctioned. McKelvey, 789 F.2d at 1520.
 In this case, it is clear that State Establishment's refusal to arbitrate its dispute in London, England, resulted not from any negligence on its part, but rather, from a conscious decision to forego any damages it might otherwise be able to recover in that arbitration proceeding for the chance that the district court erred in ordering arbitration, and that it could win a reversal of that order. Having found that State Establishment was correct in arguing that it should not have been required to submit its claims to foreign arbitration, this court must decide whether a less drastic sanction was available to the district court judge after State Establishment informed the court that it absolutely refused to go forth with the foreign arbitration proceeding. We believe that under the facts presented in this case, the district judge should have certified the question under Rule 54(b) of the Federal Rules of Civil Procedure, but only after State Establishment stipulated on the record that it was prepared to dismiss with prejudice all claims that it had with the named defendants should the district court's arbitration order be affirmed by this court. Such an order would allow the district court to effectively handle the manner in which a case proceeds before it, while at the same time, by imposing a penalty upon the party seeking to circumvent the "finality" rule,[3] a party that finds its claim seriously diminished or even potentially not worth pursuing following an adverse ruling by the trial court, may have an avenue of relief from that adverse ruling. We, therefore, find that the district court abused its discretion when it did not offer to conditionally certify the arbitration question to this court.
 Conclusion
 In conclusion, we have found that the district court erred by not giving sufficient weight to the language in the bills of lading that incorporated by reference the provisions of COGSA. There being no evidence that State Establishment had actual notice of the arbitration clause found in the charter party nor any evidence that the parties expressly agreed to waive any of the protections provided for by COGSA, it should not have been required to arbitrate its claims against these defendants in London, England. Furthermore, we have also found that under the facts of this case, the district court abused its discretion in dismissing State Establishment's complaint with prejudice when it did not offer to conditionally certify the arbitration question to this court prior to dismissing the action. We, therefore, REVERSE the decision of the district court requiring arbitration and VACATE the order that dismissed State Establishment's action with prejudice and REMAND the case for futher proceedings in accordance with the opinion of this court.
 REVERSED, VACATED and REMANDED.
 
 
 
 *
 Honorable Wilbur D. Owens, Jr., Chief U.S. District Judge for the Middle District of Georgia, sitting by designation
 
 
 [1]
 The bills of lading contained the following language:
 This Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by sea which incorporates the rules relating to Bills of Lading contained in the international convention, dated Brussels 25th August, 1924 and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this clause incorporated, such terms shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from, or limitation of, liability.
 
 
 [2]
 See Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 217-221, 105 S.Ct. 1238, 1240-43, 84 L.Ed. 158 (1985) (strong federal policy in favor of enforcing arbitration agreements); and State Establishment For Agricultural Product Trading, 770 F.2d at 991 n. 5
 
 
 [3]
 In this case an unsuccessful appeal would have meant that the merits of State Establishment's claim would never have been reached