**FINE FOLIAGE OF FLORIDA, INC., Plaintiff,**

v.

**BOWMAN TRANSPORTATION, INC., Defendant.**

**No. 87–1041–CIV–ORL–18.**

United States District Court,
M.D. Florida,
Orlando Division.

Nov. 9, 1988.

Harlan L. Paul, James, Zimmerman & Paul, DeLand, Fla., for plaintiff.

Mark P. Reuter, Kroll & Tract, Miami, Fla., Kenneth E. Cohen, Hollywood, Fla., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE KENDALL SHARP, District Judge.

This case was tried before the court without a jury. Based upon the facts admitted by the parties in their joint pretrial stipulation, the testimony, the evidence admitted at trial, and the facts found by the court at trial, the court enters the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

Plaintiff Fine Foliage of Florida, Inc., a Florida corporation located in DeLeon Springs, Florida, is a grower, buyer and international shipper of decorative ferns, used in floral arrangements. This case concerns an April 29, 1987 shipment of 939 cartons of 361,800 sprays of leatherleaf fern (Rumohra adiantiformis) from DeLeon Springs for ultimate arrival in Tokyo, Japan on May 23, 1987. When inspected on May 29, 1987, in Tokyo, the fern was found to be a total loss, which was attributed to exposure to freezing temperatures. Defendant Bowman Transportation, Inc. is a common carrier, interstate trucking company, which was employed for the inland transportation of the fern.

As required by Japan, the subject fern was inspected at Fine Foliage on April 28, 1987, by the United States Department of Agriculture, and was found acceptable for shipment. Plaintiff contacted Wilk Forwarding Company, an international freight forwarder which has represented plaintiff's export business for approximately twelve years, for the purpose of effecting shipment of the subject leatherleaf fern from DeLeon Springs to Toyko. In turn, Wilk Forwarding arranged the inland transportation from DeLeon Springs to Jacksonville, Florida with defendant and the remainder of the trip, including sea passage, with Mitsui O.S.K. Lines, Ltd. (Mitsui). John Wilk of Wilk Forwarding testified that defendant was instructed to provide a semi-truck, forty-foot refrigerated container (reefer), which would be maintained at 39° Fahrenheit. Plaintiff had used defendant Bowman many times in the past for inland transportation of fern.

The testimony clarified that it is common knowledge in the fern business that perishable fern must be shipped at temperatures varying only from 38° to 40° Fahrenheit. Following harvest, fern is immersed in a hydrocooler and treated with fungicide. Subsequently, the fern is packaged in plastic, placed in cartons, and stored in an air-cycled cooler at 38° to 40° Fahrenheit while awaiting shipment. Jack Shuman, one of plaintiff's principals, testified that plaintiff's fern is not subjected to temperatures lower than 38° Fahrenheit or higher than 42° Fahrenheit prior to shipment. When fern is exposed to freezing temperatures, 32° Fahrenheit and below, for a sufficient time, the plant cells are destroyed and the rotting process commences. While fern may appear dark green in a frozen or not completely thawed state, three to five hours after thaw, the fern becomes brown. In order for a layer of ice to form in the shipping carton, the fern has been subjected to freezing temperatures and damage

has occurred. Ray Hagstrom, whose family has been in the fern business for sixty years and who is a competitor of plaintiff, testified that fern could not survive two hours at 0° Fahrenheit.

Because maintenance of the proper temperature is critical to the shipment of fern, it is standard in the industry to place a Ryan recorder, a specialized recording or charting thermometer, on the reefer. Shuman testified that plaintiff "always" uses a Ryan recorder for fern shipments. The Ryan recorder, capable of charting the temperature within the container for thirty-two days, generally is placed in the container halfway through the loading of the fern, and usually is sealed. At the end of the inland transportation when the fern is unloaded for the overseas portion of the shipment, the temperature chart is consulted. Deviation from the required temperature results in a survey of the fern to determine if it has been damaged before the shipment is sent abroad.

Defendant had in effect at the time of the subject shipment an Interstate Commerce Commission (ICC) Container Tariff applicable within the United States to interstate traffic when such transportation was performed by owner-operations leased to defendant. Item 810 of the tariff, ICC BOWM 700–B for Bowman Transportation, Inc. states as follows:

### PROTECTIVE SERVICE

Under the provisions of this tariff, BOWM will *NOT* accept shipments that require BOWM to provide refrigeration or other protective service. Shipments accepted by BOWM which are subject to temperature damage are accepted only at shipper's risk and responsibility.

Wilk, who frequently had obtained defendant to transport fern for plaintiff, testified that on all past occasions the container temperature had been set at 38° to 40° Fahrenheit. He also testified that Bowman never had told him that it would not absolutely guarantee temperature control. Richard Sobeyroux, a Jacksonville Bowman employee, testified that defendant is aware of the differing refrigeration temperatures for transportation of such shipments as fern or produce. Furthermore, Sobeyroux testified that it is common knowledge in the industry that fern is shipped between 38° to 40° Fahrenheit.

Defendant leased the forty-foot refrigerated container from General Transportation Services in Jacksonville, Florida on April 28, 1987. The equipment interchange receipt indicates that the temperature setting was to be 39° Fahrenheit. Leonard Davis, the Bowman driver, obtained the reefer at the Bowman Jacksonville yard at approximately 9:30 p.m. on April 28, 1987.

En route to DeLeon Springs, Davis stopped and "fired up" or activated the container cooling system. He testified that he assumed that the cooling blower unit was operating. He also testified that no one instructed him to check the temperature setting on the unit. While Sobeyroux explained that most drivers are not educated to adjust the temperature setting of the Ryan recorder, Davis testified that there is another thermometer on the front of the container close to the cab. Apparently, this thermometer allows the driver to monitor the temperature inside the container. From experience and instruction, Davis testified that he had hauled enough fern to "know that the fern is supposed to go between thirty-eight and forty degrees."

Davis arrived at Fine Foliage in DeLeon Springs at approximately midnight, and slept in the truck while waiting for the cooling system to cool the container. He was awakened at 8:00 to 8:30 a.m. on April 29, 1987, when plaintiff's employees informed him that the cooling blowers had not been operating and that the container had not pre-cooled. Davis testified that one of plaintiff's employees "punched the reset button," the blowers were activated, and the container door was closed for thirty to forty-five minutes in order for the reefer to cool.

Davis testified that plaintiff's employees loaded the container from approximately 9:30 to 10:30 or 11:00 a.m. on April 29, 1987, and sealed the container. Unless he is paid to do so, Davis does not assist with the loading. After the reefer was loaded

and sealed, Davis left Fine Foliage in DeLeon Springs at approximately 11:00 or 11:15 a.m. on April 29, 1987, and drove the fern shipment to Savannah, Georgia.

Defendant transported the inland portion of the subject fern shipment from DeLeon Springs to Savannah under two bills of lading. The first bill of lading, dated April 29, 1987, and arranged by Wilk for the DeLeon Springs to Jacksonville transit, is signed by defendant's driver Davis. It states that the shipper is plaintiff in DeLeon Springs, Florida, and that the consignee is Classic Japan Ltd. in Tokyo, Japan. It further identifies the trailer as MOLU 502013-4, the Ryan recorder as 534552, the contents as 939 cartons, and the seal as # 918700. The temperature is listed as "39 Degrees," and conspicuously imprinted on the bill of lading are the words: "PERISHABLE Keep From Heat or Frost." While the bill of lading is not a Bowman document, it, nevertheless, neither mentions Bowman's tariff, Item 810, nor incorporates defendant's tariff or its long-form bill of lading.

Davis admitted signing this bill of lading on which the 39° Fahrenheit temperature is designated. He, however, testified that he did not read the document and that it was merely part of the customary paperwork that he was required to sign. He testified that he was aware that there was a Ryan recorder in the reefer, but that he did not know the temperature setting. His signature appears on a separate Ryan recorder thermometer notice, dated April 29, 1987.

The second bill of lading, dated April 30, 1987, and arranged by Mitsui through its agent Strachan Shipping Company, is a Bowman straight bill of lading and covers the Jacksonville to Savannah portion of the inland transportation of the subject fern pursuant to an overriding equipment interchange. In effect, Bowman was hired for the Jacksonville to Savannah portion of the trip by Mitsui. The Mitsui equipment interchange receipt, dated April 30, 1987, states regarding the temperature setting, "Set 0° F. Tep +10° F." The fine-print portions on the copy of the second bill of lading entered into evidence are illegible.

Consequently, there is no readable indication, if any, of Bowman's tariff, Item 810, or of the incorporation of its tariff or long-form bill of lading. Bowman employee Sobeyroux testified that neither Mitsui nor Strachan advised that the temperature should be protected on the reefer from Jacksonville to Savannah.

The complete trip from DeLeon Springs to Savannah took Davis approximately five hours, with one hour spent changing a flat tire. He testified that it takes approximately two to two and a half hours for a container temperature setting at 0° Fahrenheit to reach that temperature. Wilk testified that the travel time from DeLeon Springs to Jacksonville is approximately two and a half hours. After arrival at the Bowman yard in Savannah at approximately 4:30 p.m., Davis was requested to check the container temperature, which he found to be 40° Fahrenheit. He also testified that he had not checked the temperature of the container from the time he obtained the reefer in Jacksonville until he arrived in Savannah.

Inspection of the temperature chart at the Savannah port, however, revealed that the temperature in the container had been set improperly. Strachan, therefore, requested a survey of the leatherleaf fern. The survey was performed by marine surveyor Robert H. Feeney of Southeastern Marine Shipping Company in Savannah. In relevant part, his survey, dated May 6, 1987, although performed on April 30, 1987, describes his inspection of the fern in the following manner:

Two of the cartons were removed from the container and opened. The cargo, i.e.: ferns, were packaged in clear plastic. (See photo # 3) A thin layer of ice was sighted on the ferns resting on the top layer. No ice was sighted on the other layers. Random spike temperatures were taken in two of the cartons with a reading of 42 degrees F. low and 44 degrees F. high.

The refrigerator unit had been turned off and was not operating when the undersigned arrived at the container. Also the disc had been removed approximately

one hour before the survey was performed. At the time the disc was removed it showed a temperature reading of 0 degrees F. which is the temperature the unit had been set for when it left DeLeon Springs, Florida. This of course was an improper setting for the type of cargo being shipped in the container. The proper setting should have been 39 degrees F. The recording disc is enclosed with this report.

The cargo did not appear to be damaged because of the low setting of the temperature (0 degrees F.). The ice sighted on the top layers melted quickly when exposed to the sun light. There was no evidence of discoloration or brittleness or any other damage to the cargo itself.

Based on this survey and the apparent lack of damage to the fern, Mitsui decided to continue the shipment of the leatherleaf fern to Tokyo aboard the Astro Prosperity on May 1, 1987.

The May 1, 1987, Mitsui bill of lading for the ship, however, not only conspicuously states that the temperature was to be maintained at 39° Fahrenheit, but also prominently specifies the following exception:

EXCEPTION: CONTAINER RECEIVED BY CARRIER AT ZERO DEGREES FARENHEIT [sic]. CARRIER NOT RESPONSIBLE FOR POSSIBLE DAMAGE TO CARGO DUE TO INCORRECT TEMP. SETTING.

Wilk testified that the purpose of the exception was to relieve Mitsui of any claim resulting from the incorrect temperature setting. The reverse side of the Mitsui bill of lading states that its shipping conditions incorporate the carrier's standard container long-form bill of lading, effective at that time. Defendant was not a party to the overseas Savannah to Tokyo leg of the shipment.

The Astro Prosperity arrived in Tokyo on May 23, 1987, and plaintiff's consignee, Classic Japan Ltd. with whom plaintiff had been doing business for ten years, requested a survey, which was performed on May 29, 1987. The survey report, dated July 1, 1987, states that *"all of the fern could not be used for intended purpose and the Fern in 939 cartons were obliged to be abandoned, say 'Total Lossa.'"* Regarding the reason for the loss, the survey report continued:

Cause of Damage

The fern, stowed in the container No. MOLU–5020134, must have been exposed in lower carrying temperature and frozen and then, the ferns were thawed during the transportation of [sic] the shipper's yard and Barden city terminal, Savannah and the damage must have aggravated little by little.

On July 22, 1987, Classic Japan Ltd. notified plaintiff of a debit to its account for the loss. Subsequently, plaintiff made a claim against defendant for $21,035.60, the amount of the fern loss and documented, related expenses for the shipment to Japan of the leatherleaf fern. Plaintiff alleged that the fern was destroyed before arrival in Savannah because of defendant's failure to maintain the requested 39° Fahrenheit temperature. Shuman testified that there were no complaints regarding other fern, sent abroad and stored in the same cooler as the subject fern.

In a letter dated August 31, 1987, Reid Hanes, director of defendant's cargo claims disallowed plaintiff's claim on behalf of Bowman and enumerated the reasons for defendant's position. Bowman's foremost contention is that its tariff, Item 810, precludes the claim. Essentially, the other reasons asserted by defendant to avoid liability attempt to place the cause of the loss of the subject fern on other entities, which had some opportunity to control the temperature of the container. Specifically, defendant alleges that the container obtained from General Transportation Services by Bowman had a pre-set temperature of 0° Fahrenheit, and that there were drastic fluctuations in the temperature of the container while it was in the care and custody of Mitsui.

At the close of defendant's case, the court reviewed the basic facts with the parties. The court made the following summary factual findings relevant to the

legal analysis of this case: the subject leatherleaf fern were in good condition when loaded on the reefer on April 29, 1987, the fern were ruined by the time of arrival in Savannah because of their exposure to freezing temperatures, and all parties had notice of potential damage when the original 0° Fahrenheit setting was discovered in Savannah. The parties did not object to these findings.

Furthermore, the court concluded that this case would be resolved on the legal issues since the facts were not in dispute. In this action, plaintiff pursues its claim against defendant for $21,035.60, plus costs, and interest and attorneys' fees under the Florida Statutes. As shipper, plaintiff contends that it is protected and entitled to recover its loss from defendant under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 11707, formerly 49 U.S.C. App. § 20(11). Defendant maintains that its tariff excludes it from liability as to the leatherleaf fern loss.

## CONCLUSIONS OF LAW

The court has jurisdiction of this action pursuant to the Carmack Amendment, 49 U.S.C. § 11707(d)(2)(B) and 28 U.S.C. § 1337(a). Since the two inland bills of lading pertain to the same shipment and carrier, the court concludes that the jurisdictional amount of $10,000.00 for each has been met. 28 U.S.C. § 1337(a). Initially, the court must determine the applicability of the Carmack Amendment. Then, the court must resolve the interaction between plaintiff's claimed protection under the Carmack Amendment and defendant's alleged exclusion from liability through its tariff filed with the ICC.

■ "The Carmack Amendment applies when the ICC has jurisdiction over the shipment in question, 49 U.S.C. § 11707(a)." *Swift Textiles, Inc. v. Watkins Motor Lines, Inc.*, 799 F.2d 697, 699 (11th Cir. 1986), *cert. denied*, 480 U.S. 935, 107 S.Ct. 1577, 94 L.Ed.2d 768 (1987). Not only does the ICC have jurisdiction over interstate shipments, but also it has jurisdiction over shipments "between a place in ... the United States and a place in a foreign country to the extent the transportation is in the United States," under its " 'continuation of foreign commerce' " provision. 49 U.S.C. § 10521(a)(1)(A) & (E); *Swift Textiles*, 799 F.2d at 699. In a factually reverse foreign to domestic shipment case, the Eleventh Circuit adhered to the " 'intent' inquiry" for modern interstate commerce analysis and held that the initial intention, encompassing ultimate destination, governs the applicability of the Carmack Amendment to the domestic leg of a shipment, provided that the domestic leg is covered by a separate bill of lading. *Swift Textiles*, 799 F.2d at 700–01; *see also United States v. Erie R.R. Co.*, 280 U.S. 98, 101–02, 50 S.Ct. 51, 52–53, 74 L.Ed. 187 (1929) (The nature of a shipment is determined by "the essential character of the commerce."); *Atlantic Coast Line R.R. Co. v. Standard Oil Co.*, 275 U.S. 257, 268–69, 48 S.Ct. 107, 110–11, 72 L.Ed. 270 (1927) ("[T]he character of the commerce is a matter of weighing the whole group of facts in respect to it."); *State of Texas v. Anderson, Clayton & Co.*, 92 F.2d 104, 107 (5th Cir.) ("It is well settled that, in determining whether a particular movement of freight is interstate or intrastate or·foreign commerce, the intention existing at the time the movement starts governs and fixes the character of the shipment."), *cert. denied*, 302 U.S. 747, 58 S.Ct. 265, 82 L.Ed. 578 (1937). Additionally, the Eleventh Circuit found it irrelevant to a determination of " 'continuation of foreign commerce' " that the domestic and foreign legs of the shipment may be effected by different carriers or shippers and that the consignee or its agent takes temporary custody of the goods. *Swift Textiles*, 799 F.2d at 701; *see Atlantic Coast Line*, 275 U.S. at 268, 48 S.Ct. at 110; *Anderson*, 92 F.2d at 107.

In this case, the destination intent was clear from the outset, as evidenced in the initial bill of lading. The subject leather leaf fern was to be shipped from DeLeon Springs, Florida to Tokyo, Japan. Furthermore, there were separate bills of lading for the land and sea transit. Since defendant handled the transportation of the fern from DeLeon Springs, Florida to Savannah,

Georgia, the court concludes that the Carmack Amendment is applicable to the domestic leg of the shipment by Bowman, the carrier. Having determined the applicability of the Carmack Amendment to this action does not terminate the court's analysis. The interrelationship between the Carmack Amendment protection to shipper-plaintiff and the ICC tariff of carrier-defendant must be resolved.

In pertinent part, the Carmack Amendment provides:

(a)(1) A common carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission ... and a freight forwarder shall issue a receipt or bill of lading for property it receives for transportation under this subtitle. That carrier or freight forwarder and any other common carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Commission ... are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by (1) the receiving carrier, (2) the delivering carrier, or (3) another carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading.... Failure to issue a receipt or bill of lading does not affect the liability of a carrier or freight forwarder. A delivering carrier is deemed to be the carrier performing the line-haul transportation nearest the destination but does not include a carrier providing only a switching service at the destination.

(c)(1) A common carrier may not limit or be exempt from liability imposed under subsection (a) of this section except as provided in this subsection. A limitation of liability or of the amount of recovery or representation or agreement in a receipt, bill of lading, contract, rule, or tariff filed with the Commission in violation of this section is void.

49 U.S.C. § 11707(a)(1) & (c)(1). Pursuant to 49 U.S.C. § 11707(c)(4), a motor common carrier or freight forwarder may limit its liability under 49 U.S.C. § 10730(b)(1) in the following specific manner:

(b)(1) [A] motor common carrier providing transportation or service subject to the jurisdiction of the Commission ... or a freight forwarder may ... establish rates for the transportation of property (other than household goods) under which the liability of the carrier or freight forwarder for such property is limited to a value established by written declaration of the shipper or by written agreement between the carrier or freight forwarder and shipper if that value would be reasonable under the circumstances surrounding the transportation.

49 U.S.C. § 10730(b)(1).

■ "The purpose of the Carmack Amendment was to relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." *Reider v. Thompson,* 339 U.S. 113, 119, 70 S.Ct. 499, 502, 94 L.Ed. 698 (1950); *see Arnold J. Rodin, Inc. v. Atchison, T. & S.F. Ry. Co.,* 477 F.2d 682, 688 (5th Cir.1973). The initial or delivering carrier then may seek to recover damages from the connecting carrier which had possession of the goods when loss was sustained. 49 U.S.C. § 11707(b); *Rodin,* 477 F.2d at 688. A shipper establishes a prima facie case of the carrier's negligence and liability by evincing proof by a preponderance of the evidence that the goods: "1) were delivered to the carrier in good condition, 2) arrived in damaged condition, and 3) resulted in the specified amount of damage." *Offshore Aviation v. Transcon Lines, Inc.,* 831 F.2d 1013, 1014 (11th Cir. 1987) (per curiam); *see Missouri Pacific R.R. Co. v. Elmore & Stahl,* 377 U.S. 134, 138, 84 S.Ct. 1142, 1145, 12 L.Ed.2d 194 (1964); *Frosty Land Foods International, Inc. v. Refrigerated Transport Co.,* 613 F.2d 1344, 1346 (5th Cir.1980). The burden of proof then shifts to the carrier to show by a preponderance of the evidence that it was free from negligence and that the damage was caused solely by "(a) the act

of God, (b) the public enemy, (c) the act of the shipper, (d) public authority, or (e) the inherent vice or nature of the goods." *Frosty Land Foods*, 613 F.2d at 1346–47; *see Elmore & Stahl*, 377 U.S. at 137–38, 84 S.Ct. at 1144–45. Other than showing freedom from negligence and damage to the cargo because of one of the excepted causes, a carrier may not limit its liability by a method, which is not provided by the Carmack Amendment, such as a tariff. *Elmore & Stahl*, 377 U.S. at 137–38, 84 S.Ct. at 1144–45; *see* 49 U.S.C. § 11707(c)(1).

■ At trial, the court found that the subject leatherleaf fern was in good condition when loaded by plaintiff's employees onto the reefer for transportation by defendant on the morning of April 29, 1987. When a shipment is not open and visible, the shipper must substantiate the condition of the goods. *Offshore Aviation*, 831 F.2d at 1014; *see Highlands Insurance Co. v. Strachan Shipping Co.*, 772 F.2d 1520, 1521 (11th Cir.1985). The court's finding was based upon the approval of the fern by the Department of Agriculture; the testimony as to the care and temperature control of the fern after its harvest; and the fact that other fern, packaged in the identical manner and stored in the same cooler as the subject fern, arrived at overseas destinations in acceptable condition.

The court also found that the subject fern was ruined upon arrival in Savannah, although the total loss of the shipment was not declared until arrival and inspection in Tokyo. This finding is founded upon the 0° Fahrenheit temperature setting in the container as evidenced by the temperature chart and the credible testimony regarding the consequent detriment to fern caused by exposure to freezing temperatures. Finally, plaintiff has substantiated its damages attributed to the loss of the subject fern at $21,035.60. The court concludes that plaintiff has established its prima facie case of defendant's liability for negligence.

Since plaintiff has established a prima facie case, the burden of proof shifts to defendant to show that it was free from negligence and that the loss of the fern was the result of one of the excepted causes, alleviating the carrier from liability. *Elmore & Stahl*, 377 U.S. at 137–38, 84 S.Ct. at 1144–45; *Frosty Land Foods*, 613 F.2d at 1346–47. It is clear from the testimony and evidence that the loss of the subject fern occurred because of its exposure to freezing temperatures during its transportation from DeLeon Springs to Savannah. The court, therefore, must determine if defendant has shown that it was free from negligence regarding the temperature of the container and if the loss of the fern was the result of one of the liability-limiting exceptions.

■ Wilk had requested Bowman to provide a container set at 39° Fahrenheit for the transportation of the subject fern. The General Transportation Services equipment interchange receipt shows a container temperature setting of 39° Fahrenheit, indicating Bowman's knowledge and request of this temperature. The inland bill of lading, dated April 29, 1987, and signed by Davis, the Bowman driver, states that the temperature for the container is to be "39 Degrees." Conspicuously imprinted on the face of the bill of lading is the notice or warning, "PERISHABLE Keep From Heat or Frost." Furthermore, defendant was aware from its own experience of the required temperature for fern transportation. It is undisputed that the temperature was set at 0° Fahrenheit when the reefer left DeLeon Springs and that the hours spent at this temperature destroyed the fern before it arrived in Savannah. The damage to the fern, however, was not visible when inspected there because the fern apparently was in frozen to recently thawed states, causing it to retain a dark green color.

While Davis testified that he did not read the bill of lading before he signed it, he also testified that he was aware from his experience of the common-knowledge necessity of transported fern being kept at temperatures ranging from 38° to 40° Fahrenheit. Moreover, Davis had notice that the cooling mechanism in the container was not functioning properly when it was discovered that the cooling blowers were not operating on the morning of April 29, 1987, at DeLeon Springs. Plaintiff's employees

reset the switch on the container cooling system, and only thirty to forty-five minutes were allowed for the container to pre-cool before loading. Davis, who from his testimony had some knowledge of the time required for cooling a container, had thought that he had activated the entire cooling system en route to DeLeon Springs the previous night. It seems logical and reasonable that Davis would have noted the temperature and temperature setting of the container prior to or during the loading of the fern in order to determine if the reefer had accurately pre-cooled. Even if he was not able to adjust the temperature setting, Davis could have called the improper setting to the attention of plaintiff's employees.

Applying "the well-settled principle of law that a common carrier cannot by agreement relieve itself of liability for its own negligence," the former Fifth Circuit found the provision of an improper container for the subject goods to be negligent. *Federated Department Stores, Inc. v. Brinke,* 450 F.2d 1223, 1227 (5th Cir.1971). *Brinke,* involved a shipment of electric fans from the shipper's Brooklyn warehouse to plaintiff-consignee's Miami location. The shipper "for some time" had used a particular freight forwarder, who, in the past, "had always provided an enclosed van for such shipments." *Brinke,* 450 F.2d at 1225. On the occasion in question an open or canvas-top van with a polyethylene lining was provided. Upon arrival in Miami, the van was water-logged and the fans were damaged irreparably.

Although the bill of lading denoted "shipper's load and count," the court concluded that there was no amelioration of liability as to the carrier under the Carmack Amendment because the damage was not the result of the loading, but "came directly from inadequate equipment known specifically to the carrier to be deficient." *Brinke,* 450 F.2d at 1226; *cf. Trautmann Bros. Co. v. Missouri Pacific R.R. Co.,* 312 F.2d 102 (5th Cir.1962); *Atlantic Coast Line Ry. Co. v. Georgia Packing Co.,* 164 F.2d 1 (5th Cir.1947) (These cases were decided in favor of the carrier because there was reasonable compliance by the carrier with the instructions of the shipper.). The bill of lading has been considered a contract between the shipper and carrier. *Southern Ry. Co. v. Prescott,* 240 U.S. 632, 639, 36 S.Ct. 469, 472, 60 L.Ed. 836 (1916); *see also Calmaquip Engineering West Hemisphere Corp. v. West Coast Carriers Ltd.,* 650 F.2d 633, 638 (5th Cir. Unit B 1981) (Under the Carriage of Goods by Sea Act, 46 U.S.C. App. §§ 1300 *et seq.,* a material deviation from the bill of lading by the carrier has been held to make the carrier an insurer of the shipped goods.).

In this case, the testimony was that defendant Bowman had transported plaintiff's inland shipment of fern frequently before the shipment in question. There was no testimony that defendant's past services had not been to plaintiff's satisfaction, which necessarily would include correct temperature control. Defendant and its driver Davis obviously were aware of the proper temperature for transporting fern.

Given defendant's explicit instructions regarding the 39° temperature setting on the bill of lading, defendant's course of dealing with plaintiff, defendant's general knowledge of the proper temperature for transporting fern, and defendant's notice that the cooling system had malfunctioned, the court concludes that defendant was negligent in its failure to reasonably comply with the bill of lading by providing a container with the temperature set at 0° Fahrenheit, which resulted in the destruction of the subject fern. Although the subject bill of lading did not specify that plaintiff-shipper was to count and load the shipment, there was no evidence that the loading or any other act of plaintiff's employees caused the loss of the fern.

In order to counter plaintiff's prima facie case, defendant would have to demonstrate by a preponderance of the evidence that it was not negligent and that the damage to the subject fern was a result of one of the excepted causes. *Elmore & Stahl,* 377 U.S. at 137–38, 84 S.Ct. at 1144–45; *Frosty Land Foods,* 613 F.2d at 1346–47. Because the court has concluded that defendant has not shown its lack of negligence,

defendant necessarily has not met its two-part burden to rebut plaintiff's prima facie case. Even if the court had determined that defendant was not negligent, the only potentially applicable excepted causes, act of the shipper and nature of the goods, have been discredited. The court has found herein that no act of the shipper caused the loss of the fern and that the destruction of the fern was the result of exposure to imposed freezing temperatures. Accordingly, plaintiff's prima facie case of defendant's negligence and consequent liability has not been refuted. *See Frosty Land Foods,* 613 F.2d at 1346–47.

■ Having determined that defendant was negligent under the Carmack Amendment, the court must continue its analysis by deciding the effect of defendant's operative ICC tariff at the time in question. The court, therefore, must examine the interrelation of the Carmack Amendment and defendant's ICC tariff. That tariff, Item 810, exempts defendant from liability regarding goods that require refrigeration or other protective service, and states that shipments by Bowman which require refrigeration are accepted at the shipper's risk and responsibility.

The Carmack Amendment unequivocally states that a limitation of liability by a carrier in a "tariff filed with the Commission in violation of this section is void." 49 U.S.C. § 11707(c)(1). If a carrier does want to limit its liability, then § 11707(c)(4) permits under § 10730 a specific procedure: a common carrier or freight forwarder may limit its liability to a value reasonable under the circumstances of the transportation "by written declaration of the shipper or by written agreement between the carrier or freight forwarder and shipper." 49 U.S.C. § 10730(b)(1). The court notes that defendant did not utilize either method delineated by § 10730(b)(1).

Required tariffs, which are rates or charges filed with the appropriate regulatory agency, have been held to bind carriers and shippers with the force of law. *See Lowden v. Simonds–Shields–Lonsdale Grain Co.,* 306 U.S. 516, 520, 59 S.Ct. 612, 614, 83 L.Ed. 953 (1939); *Allstate Insur-*

*ance Co. v. International Shipping Corp.,* 703 F.2d 497, 500 (11th Cir.1983); *Seaboard Coast Line R.R. Co. v. National R.R. Passenger Corp.,* 645 F.2d 513, 515 (5th Cir. Unit B 1981); *State of Israel v. Metropolitan Dade County,* 431 F.2d 925, 928 (5th Cir.1970). Nonmandatory tariff provisions filed by carriers, such as Item 810, have been recognized by the Eleventh Circuit to be ineffective against shippers, when actual notice is not given the shipper that the nonmandatory tariff arguably conflicts with protections afforded the shipper under federal statutes. *Swift Textiles,* 799 F.2d at 703; *see State Establishment for Agricultural Product Trading v. M/V Wesermunde,* 838 F.2d 1576, 1581–82 (11th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 273, 102 L.Ed.2d 262 (1988); *Allstate,* 703 F.2d at 500. This case is distinguished from *Swift Textiles* wherein the court found that the Carmack Amendment expressly contemplated the statute of limitations at issue in that case. *Swift Textiles,* 799 F.2d at 703–04. In contrast, the Carmack Amendment specifically forbids a carrier's limitation of liability for loss as was sustained in this case, unless a designated procedure of a written shipper declaration or agreement between carrier or freight forwarder and shipper is utilized. The court has observed that this procedure was not followed.

Even alleged notice, where carriers have incorporated long-form bills of lading in short-form bills of lading, has been held invalid against shippers when allowing the referenced document to control would violate the shipper's protection under the applicable federal statute. *Allstate,* 703 F.2d at 499–500; *Encyclopedia Britannica, Inc. v S.S. Hong Kong Producer,* 422 F.2d 7, 11–15 (2d Cir.1969), *cert. denied,* 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970); *see M/V Wesermunde,* 838 F.2d at 1579–82. The former Fifth and Eleventh Circuits have been "reluctant to give effect to limiting clauses with which 'a carrier could shield itself from liability through manipulation of fine print clauses contained in standardized contract forms.'" *Swift Textiles,* 799 F.2d at 703 (quoting *Calmaquip Engineering,* 650 F.2d at 639). The

court notes that the subject inland bill of lading, signed by defendant's driver Davis, has no reference whatsoever to a long-form bill of lading or to Bowman's protective-service tariff, Item 810. Not only is defendant precluded from arguing that plaintiff had notice of its tariff, Item 810, through incorporation by reference, but also, even if it were so incorporated, Item 810 blatantly is violative of the prohibitions on carrier liability in the Carmack Amendment. Inasmuch as defendant did not employ the procedure provided in the Carmack Amendment for limiting its liability, Bowman's tariff must succumb to the protection afforded plaintiff through the Carmack Amendment.

Having concluded that plaintiff's protection under the Carmack Amendment surmounts defendant's protective-service tariff, the court also has concluded herein that plaintiff has established a prima facie case of defendant's negligence as the carrier. "The terms of the bill of lading were clear; the carrier simply failed to perform them." *Calmaquip Engineering*, 650 F.2d at 639. Accordingly, the court concludes that plaintiff prevails on the merits of this action under the Carmack Amendment and is entitled to recover its money damages of $21,035.60 attributed to the loss of the subject leatherleaf fern with costs and interest.

■ Plaintiff, however, has requested interest and attorneys' fees under the Florida Statutes. With its enactment of the Carmack Amendment, Congress superseded diverse state laws and remedies by creating a uniform national policy to govern the liability of interstate carriers for property loss. *New York, N.H. & H.R.R. Co. v. Nothnagle*, 346 U.S. 128, 131, 73 S.Ct. 986, 988, 97 L.Ed. 1500 (1953); *see American Ry. Express Co. v. Levee*, 263 U.S. 19, 21, 44 S.Ct. 11, 12, 68 L.Ed. 140 (1923); *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1412–15 (7th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988). Consequently, "the liability of a carrier for damage to an interstate shipment is a matter of federal law controlled by federal statutes and decisions." *Elmore & Stahl*, 377 U.S. at 137,

84 S.Ct. at 1144. The court, therefore, must allow only the relief provided in the Carmack Amendment and under federal law in its determination of plaintiff's request for interest and attorneys' fees.

Under 28 U.S.C. § 1961, a uniform federal rate is provided for postjudgment interest. The application of this rate, rather than the Florida rate, complies with the goal of the Carmack Amendment to establish consistent federal law in the commerce area. *See Louisiana & Arkansas Ry. Co. v. Export Drum Co.*, 359 F.2d 311, 317 (5th Cir.1966). Therefore, plaintiff is entitled to postjudgment interest at the statutory rate supplied in 28 U.S.C. § 1961.

■ Plaintiff also has requested attorneys' fees under the Florida Statutes. There is no provision for attorneys' fees under the Carmack Amendment. The well-established rule is that "each party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary." *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983); *Reeves v. Harrell*, 791 F.2d 1481, 1483 (11th Cir. 1986), *cert. denied*, 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987). Accordingly, plaintiff is not entitled to attorney's fees under the Carmack Amendment.

In summary and on the particular facts of this case, the court has determined that plaintiff has prevailed on its claims under the Carmack Amendment as discussed herein. The Clerk of Court shall enter judgment in favor of plaintiff in the amount of $21,035.60 plus costs and interest at the statutory rate provided in 28 U.S.C. § 1961.

It is SO ORDERED.