**SWIFT TEXTILES, INC.,**
Plaintiff-Appellant,

v.

**WATKINS MOTOR LINES, INC.,**
Defendant-Appellee.

No. 85–9005.

United States Court of Appeals,
Eleventh Circuit.

Sept. 15, 1986.
Rehearing and Rehearing En Banc Denied
Oct. 23, 1986.

Edwin D. Robb, Jr., Savannah, Ga., for plaintiff-appellant.

John B. Miller, Savannah, Ga., for defendant-appellee.

Before HILL and VANCE, Circuit Judges, and BROWN,* Senior Circuit Judge.

JOHN R. BROWN, Circuit Judge:

A shipper whose goods were damaged in transit appeals from the District Court's ruling that its claim is barred by a statute of limitations contained in the carrier's tariff and incorporated by reference into the bill of lading. We conclude that the shipment in question came within ICC jurisdiction as a "continuation of foreign commerce" and that the bill of lading sufficiently incorporated the statute of limitations contained in the carrier's tariff. We therefore affirm.

### How Swift Wasn't

The facts of this case are simple and not in dispute. Swift Textiles, Inc. (Swift) contracted to buy certain textile spinning machinery from a Swiss corporation. The machinery was placed in containers in Switzerland, shipped by rail to Hamburg, and loaded aboard a ship. The bill of lading issued by the ocean carrier shows Swift as the notify party in Savannah, Georgia and Swift's customs broker as the consignee.

The containers actually were unloaded in Charleston, South Carolina and trucked to Savannah under the ocean bill of lading. Upon their arrival in Savannah, they were stored temporarily until Swift's customs

broker arranged with Watkins Motor Lines (Watkins) to truck the containers from Savannah to LaGrange, Georgia, their intended destination inland. The transit from Savannah to LaGrange was under a short form bill of lading prepared by Swift's customs broker. The bill of lading was a preprinted standardized form which provided that the shipper was "familiar with all the terms and conditions of the [Uniform Domestic Straight B]ill of [L]ading ... set forth in the classification or tariff which governs the transportation of the shipment and the said terms and conditions are hereby agreed to by the shipper...." The short form bill of lading also provided that the shipment would be subject to the terms of the "Uniform Domestic Straight Bill of Lading set forth ... in the applicable motor carrier classification or tariff...."

At the time of shipment, Watkins had on file with the Interstate Commerce Commission (ICC) a classification providing for a two year and one day statute of limitations for bringing suit after a claim was denied. Watkins' tariff, also on file with the ICC, expressly incorporated the classification. Watkins had no tariff on file with the Georgia Public Service Commission and presumably was not authorized to make intrastate shipments in Georgia.

While en route to LaGrange, one of the containers partially slid off the truck chassis transporting it and the contents were damaged. Swift filed a claim for the damage with Watkins and it was denied on April 19, 1982. Swift filed the present suit on May 13, 1985, more than three years after the denial of its claim. The District Court granted summary judgment for Watkins on the grounds that the applicable two year and one day statute of limitations contained in Watkins' tariff had run. Swift appeals.

### When Is an Intrastate Shipment Not An Intrastate Shipment?

The first issue before us on appeal is whether the shipment of the textile spin-

---

\* Honorable John R. Brown, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designa-

tion.

ning machinery from Savannah, Georgia to LaGrange, Georgia is covered by the Carmack Amendment, 49 U.S.C. § 11707, formerly 49 U.S.C. § 20(11). Among other things, the Carmack Amendment (amending the Interstate Commerce Act) allows carriers to provide in their contracts with shippers statutes of limitations for bringing civil suits of not less than two years.[1] Thus, if the Carmack Amendment applies, Watkins had the authority to set its statute of limitations for bringing damage claims at two years and one day (as it did in its tariff), and Swift's claim is barred. If, on the other hand, the Carmack Amendment does not apply, then the applicable statute of limitations presumably must be determined by resort to state law, a question not reached by the District Court.

The Carmack Amendment applies when the ICC has jurisdiction over the shipment in question, 49 U.S.C. § 11707(a). Among the shipments over which the ICC has jurisdiction are shipments "between a place in ... the United States and a place in a foreign country to the extent the transportation is in the United States...." 49 U.S.C. § 10521(a)(1)(E) (the "continuation of foreign commerce" provision). Swift first argues that the Carmack Amendment does not apply to the shipment because it was an intrastate shipment under a separate bill of lading, not a "continuation of foreign commerce."

■ The nature of a shipment is not determined by a mechanical inspection of the bill of lading nor by when and to whom title passes but rather by "the essential character of the commerce," *United States v. Erie R.R. Co.*, 280 U.S. 98, 102, 50 S.Ct. 51, 53, 74 L.Ed. 187, 206 (1929), reflected by the "intention formed prior to shipment, pursuant to which property is carried to a selected destination by a continuous or unified movement," *Great N. Ry. Co. v. Thompson*, 222 F.Supp. 573, 582 (D.N.D. 1963) (three-judge district court).

It is well-settled that, in determining whether a particular movement of freight is interstate or intrastate or foreign commerce, the intention existing at the time the movement starts governs and fixes the character of the shipment.... [T]emporary stoppage within the state, made necessary in furtherance of the interstate carriage, does not change its character.

*State of Texas v. Anderson, Clayton & Co.*, 92 F.2d 104, 107 (5th Cir.) (shipper intended cotton for export when cotton sent from Rochester, Texas to Houston; thus not an intrastate shipment), *cert. denied*, 302 U.S. 747, 58 S.Ct. 265, 82 L.Ed. 578 (1937).

A significant case on point applying the "intent" test is *North Carolina Utilities Commission v. United States*, 253 F.Supp. 930 (E.D.N.C.1966) (three-judge district court). In *NCUC*, a retail hardware chain received an order of iron and steel products from Belgium for distribution to eight retail stores located in various inland North Carolina cities. The order arrived by ocean carrier at the port of Wilmington, N.C. and was stored in facilities owned by the State Ports Authority for several days while the retail chain conducted an updated inventory needs determination at its various outlets. The goods then were loaded onto trucks and shipped under new bills of lading to each of the eight stores. The issue before the Court was whether the transportation by truck from Wilmington to the various inland cities was intrastate or a "continuation of foreign commerce."

The Court applied a totality of the circumstances test, *see Atlantic Coast Line R.R. Co. v. Standard Oil Co.*, 275 U.S. 257, 268–69, 48 S.Ct. 107, 110, 72 L.Ed. 270, 275 (1927), and held that the truck shipments represented a "continuation of foreign commerce" because they were intended to be part of the larger Belgium to inland North

---

**1.** "A carrier may not provide by rule, contract, or otherwise, a period of less than nine months for filing a claim against it under the section and a period of less than two years for bringing a civil action against it under the section. The period for bringing a civil action is computed from the date the carrier gives a person written notice that the carrier has disallowed any part of the claim specified in the notice." 49 U.S.C. § 11707(e).

Carolina import shipment. Significant factors relied on by the Court were that the retailer owned no distribution or storage facility in Wilmington; the goods were held in Wilmington in a state-owned warehouse for periods of usually not more than three days; the retailer owned no retail outlets in Wilmington; and no ad valorem tax was paid on the goods as they were temporarily stored in Wilmington. 253 F.Supp. at 936. In short, the retailer intended the goods to come to rest at its inland stores; it served no purpose for the goods to be in Wilmington other than for the retailer to conduct a brief inventory and then forward the goods to their intended destinations. "Wilmington ... is but a mere link in the chain of foreign commerce that continues until the goods have arrived at their intended destination, that is, at the individual ... stores." *Id.*

■ In our case, it cannot be disputed that the shipment was intended to begin in Switzerland and end in LaGrange, Georgia. There was no reason for the container to come to rest in Savannah other than for the consignee's customs broker to make arrangements for the Savannah to LaGrange leg of the journey. Applying the "intent" analysis, the fact that Watkins issued a separate bill of lading for the final intrastate leg of the journey is not significant. *See Erie R.R. Co.,* 280 U.S. at 102, 50 S.Ct. at 53, 74 L.Ed. at 207 ("[The character of the shipment] is not affected by the fact that the transaction is ... completed under a local bill of lading which is wholly intrastate....."). Thus, the shipment was a "continuation of foreign commerce," the Carmack Amendment applied to the shipment, and the statute of limitations and the tariff on file with the ICC bars Swift's claim.

Swift also argues that, under the reasoning contained in *Reider v. Thompson,* 339 U.S. 113, 70 S.Ct. 499, 94 L.Ed. 698 (1950), the Carmack Amendment does not apply to this shipment. In *Reider,* a railroad received a shipment of wool at New Orleans for transportation to Boston and it issued a through bill of lading for the shipment. When the shipment arrived in a damaged condition in Boston, the shipper sued the railroad under the Carmack Amendment. While ordinarily there would be no question but that the Carmack Amendment applied to the interstate shipment from New Orleans to Boston, the case was complicated by the fact the wool was originally transported to New Orleans via steamship from Buenos Aires, Argentina. The railroad argued that the domestic railroad leg of the shipment was merely a portion of a "through foreign shipment" conducted under a "supplemental bill of lading," and the Carmack Amendment did not apply to such a foreign shipment. *See Condakes v. Smith,* 281 F.Supp. 1014, 1015 (D.Mass. 1968) (shipment of cantaloupes from Mexico to Boston was not covered by Carmack Amendment because shipment was on a single through bill of lading).

The Supreme Court disagreed. It held that the steamship and railroad legs of the shipment were not different portions of one carriage but were in reality two entirely different movements. The Court described the New Orleans to Boston shipment as "new, separate, and distinct" from the Buenos Aires to New Orleans shipment. 339 U.S. at 117, 70 S.Ct. at 502, 94 L.Ed. at 701. Thus, the New Orleans to Boston shipment was not a continuation of a "through foreign shipment" but was merely a domestic interstate shipment and the Carmack Amendment applied.

Swift argues that the Court in *Reider* found the New Orleans to Boston shipment to be governed by the Carmack Amendment because it was separate from the Buenos Aires to New Orleans shipment and because it crossed state lines. Thus, Swift contends, because the present shipment was covered by a separate bill of lading but did *not* cross state lines, it is *not* covered by the Carmack Amendment.

We cannot accept this interpretation because to do so would vitiate the "intent" inquiry that underlies all modern interstate

commerce analysis.[2] The Court in *Reider* was unconcerned that the shipment in that case originated outside the United States because it found that the New Orleans to Boston shipment was not intended to be a continuation of the Buenos Aires to New Orleans shipment. Thus, the critical inquiry is not whether the domestic leg of the shipment crossed a state border but rather it is whether the domestic leg of the shipment was intended to be part of a larger shipment originating in a foreign country. If it is part of such a larger shipment, then it is a shipment "between a place in ... the United States and a place in a foreign country to the extent the transportation is in the United States," 49 U.S.C. § 10521(a)(1)(E), and the Carmack Amendment applies.

■ We therefore hold that when a shipment of foreign goods is sent to the United States with the intention that it come to final rest at a specific destination beyond its port of discharge, then the domestic leg of the journey (from the port of discharge to the intended destination) will be subject to the Carmack Amendment as long as the domestic leg is covered by separate bill or bills of lading. It is irrelevant that the foreign and domestic legs of the voyage are effected by different shippers or carriers, that the intended consignee or its agent takes temporary custody of the goods at the port of discharge, or that the domestic leg does not cross state lines. Thus, *Reider* does not change our conclusion that the Savannah to LaGrange shipment was intended to be part of the larger Switzerland to LaGrange carriage and as such is covered by the Carmack Amendment as a "continuation of foreign commerce."

*Incorporating the Fine Print*

■ Swift also claims that, even if the truck shipment from Savannah to La-Grange was a continuation of foreign commerce, the statute of limitations contained in Watkins' classification and incorporated in Watkins' ICC tariff was not adequately incorporated by reference in the short form bill of lading. Swift asserts that, as a shipper, it was only bound to those nonrate tariff provisions of which it had actual notice—i.e., which were contained on the short form bill of lading. It is undisputed that no explicit statute of limitations provision was contained on the short form bill of lading—on its face were printed only the general provisions that the shipment would be "subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth ... in the applicable motor carrier classification or tariff...." and that the shipper agreed to those terms.

The binding or nonbinding effect of superfluous tariff or long form bill of lading provisions is an issue that has bedeviled the courts from time to time. Carriers often insert into tariffs and long form bills of lading various limitations of liability and other burdensome provisions—not required by law to be there[3]—knowing that they will rarely be scrutinized in advance by shippers. Thus, the courts occasionally step forward to protect shippers in particularly compelling circumstances.

For example, in *Encylcopaedia Britannica, Inc. v. SS Hong Kong Producer*, 422 F.2d 7 (2d Cir.1969), the carrier issued a short form bill of lading which incorporated by reference a long form bill of lading. The long form bill of lading allowed the carrier to stow cargo on deck—unless in-

**2.** An identical analysis is used to determine which goods are subject to local property taxes and which goods are exempted from such taxation by virtue of being in interstate or foreign transit. *See, e.g., Michelin Tire Corp. v. Wages,* 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976). The same analysis also surfaces in other contexts which require that a distinction be made between interstate and intrastate commerce. *See, e.g., Galbreath v. Gulf Oil Corp.,* 413 F.2d 941 (5th Cir.1969) (truck drivers who

transported certain petroleum products were engaged in interstate commerce and thus were not entitled to overtime compensation by virtue of the Motor Carrier Act exemption to the Fair Labor Standards Act).

**3.** For ease of reference, these provisions will hereafter be referred to as "nonmandatory" provisions.

structed before loading in writing not to—and placed the risk of loss of such above-deck cargo on the shipper unless the shipper could affirmatively prove the carrier's lack of due diligence. When the shipper's containerized cargo carried above deck was water damaged in transit, the carrier attempted to raise as a defense the bill of lading provision allowing above-deck stowage. The Court held that the shipper could not invoke the long form bill of lading clause, referred to by the Court as Clause 13.

> In the first place Clause 13 places the burden of inquiry on the shipper, in circumstances in which it is highly unlikely that such an inquiry would be made, to search out a copy of the carrier's regular bill of lading to discover *a clause which in effect authorizes a serious deviation from the standard provisions* and which can only be prevented by the shipper's assuming the burden of giving notice to the carrier before delivery that below deck stowage is required. Even if the shipper, as in this case, never made any actual representation that the goods need not be stowed under deck, as Clause 13 says, never agreed that they might be stowed on deck and never had any notice or knowledge of the provisions of Clause 13, it would, nevertheless, by default lose the right to have its goods stowed below deck. Once the shipper has by default lost the right to under deck stowage, the concept behind Clause 13 assumes that the carrier is thereafter in a position to claim that the shipper has lost all its rights under COGSA because § 1301 [46 U.S.C. § 1301] by definition eliminates deck cargo from the provisions of the Act.

> · · · · ·

What adds to its unfairness is the context in which the ocean bill of lading functions. In accepting the short form, *the shipper relies upon the fact that the long form, which is incorporated by reference, contains only the usual provisions which closely follow COGSA,* unless there is some warning on the face

of the short form of special terms or exceptions which differ from the COGSA provisions. If there is no definite agreement one way or the other, the shipper is entitled to expect below deck stowage. It is impractical for a shipper to be compelled to make a detailed study of all of the fine print clauses of the carrier's regular bill on each occasion before it ships out a package. One of the principal purposes of COGSA was to obviate the necessity for doing so.

422 F.2d at 13–14 (footnote omitted, emphasis supplied, bracketed material added). Thus, although the contested clause did not violate COGSA per se and although the Court did not challenge the carrier's ability to incorporate by reference the long form bill of lading into the short form, the Court prevented the carrier from invoking the clause against the shipper.

In *Allstate Insurance Co. v. International Shipping Corp.*, 703 F.2d 497 (11th Cir.1983), the Court prevented a shipper from enforcing a one-year statute of limitations provision contained in a long form bill of lading. Before shipment, the carrier had opened the shipper's containers and placed the cargo outdoors unprotected from the elements. When the cargo insurer brought an action for the cargo damage about 20 months following delivery, the carrier raised as its defense a one-year statute of limitations contained in a long form bill of lading on file with the Federal Maritime Commission and incorporated by reference in the short form bill of lading issued to the shipper. This Court held that only the required tariff filed with the Federal Maritime Commission—not the entire long form bill of lading—had the force of law. *Id.* at 500.

> Every clause in every bill of lading filed with the FMC cannot have the force and effect of law *particularly when clauses frequently inserted in filed bills of lading have been struck as violative of public policy or existing statutes.* See *Encyclopaedia Britannica, Inc. v. SS Hong Kong Producer*, 422 F.2d 7, 12 (2d Cir.1969) (certain clauses in bills of lading violate COGSA; COGSA prevails).

*Marvirazon Compania Naviera, S.A. v. H.J. Baker & Brothers, Inc.,* 674 F.2d 364, 366 (5th Cir.1982) is on point and we find it persuasive:

> The limitation of liability provisions in the tariff, under which A & G brings this appeal, were not related to rates or charges and therefore were not required by law to be within the tariff.... knowledge of the limitation clause cannot be imputed to Marvirazon simply by filing the tariff with the Federal Trade Commission, because it is not required by law to be in the tariff.

*Id.* at n. 1, n. 2 (citation omitted).

Second, we are reluctant to give effect to limiting clauses with which "a carrier could shield itself from liability through manipulation or fine print clauses contained in standardized contract forms." *Calmaquip Engineering West Hemisphere Corporation v. West Coast Carriers Ltd.,* 650 F.2d 633, 639–40 (5th Cir. Unit B 1981) *citing Encyclopaedia Britannica, supra* at 14. In this regard we follow the Second Circuit's decision in *Encyclopaedia Britannica, supra;* we will not limit the period within which [the insurer] could bring suit when that limit was expressed in fine print in a document never specifically brought to [the shipper's] attention, and when [the shipper had no] actual knowledge of its terms. *Id.* at 14. *This is particularly so where the limitation arguably conflicts with the absence of a specific limitations period under the Harter Act.*

*Id.* (footnote omitted, emphasis supplied, bracketed material added).

Swift argues that our present case is governed by *Allstate.* Because Watkins was not required to include in its ICC tariff a statute of limitations, and because no statute of limitations was specifically referenced in its short form bill of lading, Swift claims that it is not bound by that limitation. We do not read *Allstate* and its predecessors so broadly, however.

First, neither *Allstate, Marvirazon,* nor *Encyclopaedia Britannica* held that a shipper without actual notice is not bound by *all* nonmandatory tariff provisions. In *Encyclopaedia Britannica,* the Court held that it was unfair to enforce a long form bill of lading provision which substantially modified COGSA's provisions when there was no warning to that effect contained in the short form bill of lading. 422 F.2d at 14. In *Marvirazon,* the Fifth Circuit merely held that a stevedore's tariff provision could not be invoked against an unknowing *shipowner* when it was the *charterer's* agent who contracted for the stevedoring services. 674 F.2d at 367. The *Marvirazon* Court was not confronted with the issue whether the charterer—the party who contracted with the stevedore—could be charged with knowledge of the stevedore's nonmandatory tariff provision, but the Court's extended discussion of agency principles leaves no doubt that the tariff provision could have been invoked against any principal whom the agent was authorized to represent. Finally, we do not read *Allstate* so broadly to hold that *all* tariff provisions are void as against shippers without actual notice. What upset the *Allstate* Court was that the challenged tariff provision "arguably conflict[ed] with the absence of a specific limitations period under the Harter Act." 703 F.2d at 500. Thus, the result in *Allstate* was similar to that in *Encyclopaedia Britannica:* without actual notice to the shipper, the Court refused to enforce a nonmandatory tariff provision that conflicted with the typical provisions associated with the governing federal statutes—COGSA and the Harter Act—traditionally incorporated by reference into all tariffs and long form bills of lading.

Here, however, the situation is quite different. The two-year and one day statute of limitations contained in Watkins' classification and incorporated into Watkins' tariff does not conflict with the Carmack Amendment. Rather, it is expressly contemplated and sanctioned by the Carmack Amend-

ment.[4] Furthermore, the National Motor Freight Classifications (NMF 100–H) filed by Watkins with the ICC and incorporated into Watkins' tariff is the standard in the trucking industry. Its provisions are the rule rather than the exception. We are simply not presented with the same situation faced by the Courts in *Encyclopaedia Britannica* and *Allstate.*

The second reason why we believe *Allstate* does not apply is because it was Swift's agent—its customs broker—who prepared the bill of lading of which Swift now complains. The policy behind the *Allstate* and *Encyclopaedia Britannica* holdings is simply that the courts should be "reluctant to give effect to limiting clauses with which 'a carrier could shield itself from liability through manipulation of fine print clauses contained in standardized contract forms.' *Calmaquip Engineering West Hemisphere Corporation v. West Coast Carriers Ltd.*, 650 F.2d 633, 639–40 (5th Cir. Unit B 1981) *citing Encyclopaedia Britannica, supra* at 14." *Allstate,* 703 F.2d at 500. But here we do not have a devious carrier hoping to slip a quick one over on an unsuspecting shipper. Rather it is the shipper's own agent who prepared the short form bill of lading on its own preprinted standardized contract form. If the shipper's agent thereby incorporated an industry-wide, indisputably legal, and federally sanctioned statute of limitations, the shipper cannot now be heard to complain about it.

We take no issue with *Encyclopaedia Britannica* and *Allstate*—on the facts before those Courts, the results reached were eminently reasonable and prevented injustice. But we are not prepared to strike down all tariff provisions of which a shipper has no actual notice. Such a result would quickly force carriers to enlarge the bills of lading issued to shippers into mam-

moth documents containing paragraph upon paragraph of unreadable fine print. Even with such lengthy documents in their possession, shippers would be no more inclined to read them than they are currently inclined to seek out and read long form bills of lading.

For the foregoing reasons, the District Court is in all respects correct.

AFFIRMED.

---

**4.** *See* note 1 *supra.* The Carmack Amendment on its face contemplates that the choice of a statute of limitation is to lie with the shipper subject to the minimum time limit prescribed by the Act. Although the two year and one day period is not mandatory in the sense that it is imposed as an absolute by the Act, the Act clearly anticipates statutes of limitation and legislatively approves any limitation period exceeding two years. A natural way to manifest the carrier's choice of a limitation period would be in the tariff classification which motor carriers have to file.