CAPITOL CONVERTING EQUIPMENT, INC., Plaintiff,

v.

LEP TRANSPORT, INC., Defendant.

No. 88 C 6001.

United States District Court, N.D. Illinois, E.D.

July 19, 1990.

James T. Ryan, Louis P. Svendsen, Ryan, Moore & Nelson, Ltd., Arlington Heights, Ill., for plaintiff.

Benjamin Daidone, Daidone & Daidone, P.C., Niles, Ill., Kenneth E. North, Kathleen M. Smith, Kenneth E. North & Associates, Ltd., Glen Ellyn, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

In the wake of an alleged failure on the part of defendant Lep Transport ("Lep") to deliver a folder-gluer machine to Chicago, plaintiff Capitol Converting Equipment ("Capitol") brought this action, asserting originally a state law breach of contract claim. Memoranda submitted by the parties in the course of a motion for partial summary judgment raised the possibility that the Carmack Amendment applied to this dispute. In an October 11, 1989, Memorandum and Order, this court held that the Carmack Amendment, if applicable here, would preempt state contract law; finding the question of Carmack Amendment applicability to implicate issues that had been inadequately developed by the parties, however, we declined to rule on it at that time. Capitol subsequently filed an amended complaint, asserting in count I that Lep is liable for the loss of the folder-gluer machine pursuant to the Carmack Amendment and in count II that Lep is liable on the basis of state contract law. Now before this court is Lep's motion for summary judgment on count I of the amended complaint and on an affirmative defense to count II.

### 1. Applicability of the Carmack Amendment

Lep argues that count I should dismissed for lack of jurisdiction because this dispute does not fall within the purview of the Carmack Amendment. We agree. By its own terms, the Carmack Amendment applies to "[a] common carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under subchapter I, II, or IV of chapter 105 of this title."[1] 49 U.S.C. § 11707 (1982 & Supp. V 1987). Subchapters I, II, and IV all contain similar language restricting Interstate Commerce Commission jurisdiction to transportation "provided in the United States" between

(A) a place in a State and a place in another State, even if part of the transportation is outside the United States;

---

1. A 1986 amendment inserted the term "and a freight forwarder" after "chapter 105 of this title"; the same amendment limited subchapter IV jurisdiction to "household goods freight forwarders." See 49 U.S.C. § 10561(a) (Supp. V 1987). This amendment took effect 60 days after October 22, 1986, however, and has been held to apply only prospectively. See Wescar Freight Systems v. Conagra, Inc., 706 F.Supp. 724 (M.D.Cal.1989). The present dispute, which arises out of a contract entered into in November 1985 and performed (or possibly breached) in early 1986, is therefore not subject to the 1986 amendment.

(B) a place in a State and another place in the same State through a place outside the State; or

(C) a place in the United States and a place outside the United States.

49 U.S.C. § 10561 (1982 & Supp. V 1987); *see also* 49 U.S.C. § 10521; § 10501. This language represents a slight change from the pre–1978 incarnation of the Carmack Amendment, which encompassed transportation "from a point in one State or Territory or the District of Columbia to a point in another State, Territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country." 49 U.S.C. § 20(11) (1976).

■ Lep notes, correctly, that the older version of the Carmack Amendment does not cover goods shipped under a through bill of lading issued in a foreign country. *See Reider v. Thompson,* 339 U.S. 113, 117, 70 S.Ct. 499, 502, 94 L.Ed. 698 (1950); *Kenny's Auto Parts, Inc. v. Baker,* 478 F.Supp. 461, 464 (E.D.Pa.1979). Because the 1978 revision brought within the scope of the Carmack Amendment certain shipping involving transportation outside the United States, one court in this district has questioned whether the limitation on Carmack Amendment applicability set forth in *Reider* and *Kenny's* continues to have force. *See Marine Office of America Corp. v. NYK Lines,* 638 F.Supp. 393, 398 (N.D.Ill.1985). Several cases in the Eleventh Circuit have subsequently treated this issue, however, and have concluded that where a shipment involves transportation in a foreign country, "the domestic leg of the journey will be subject to the Carmack Amendment as long as the domestic leg is covered by a separate bill or bills of lading." *See Swift Textiles v. Watkins Motor Lines,* 799 F.2d 697, 701 (11th Cir.1986), *cert. denied,* 480 U.S. 935, 107 S.Ct. 1577, 94 L.Ed.2d 768 (1987); *Fine Foliage of Florida, Inc. v. Bowman Transportation,* 698 F.Supp. 1566, 1571 (M.D.Fla.1988). We find this authority persuasive.

■ The applicability of the Carmack Amendment to the contract between Capitol and Lep, then, turns on whether the bill of lading associated with the folder-gluer

machine was a through bill of lading issued abroad, a question of fact. *See Tokio Marine & Fire Insurance Co. v. Hyundai Merchant Marine Co.,* 717 F.Supp. 1307, 1309 (N.D.Ill.1989); *Marine Office,* 638 F.Supp. at 399. Factors considered in making this determination include "the final destination indicated on the [bill of lading], the conduct of the shipper and the carriers, and whether the connecting carriers were compensated by the payment made to the initial carrier or by separate consideration from the shippers." *Marine Office,* 638 F.Supp. at 399; *see also Tokio Marine,* 717 F.Supp. at 1309.

According to the affidavit of Johannes Arlinghaus ("Arlinghaus"), the branch manager of Lep's Chicago regional office, Lep contracted with an international freight forwarder, Crowe, SPA ("Crowe"), to arrange for the transportation of the folder-gluer machine to Chicago. A bill of lading was issued by the ocean carrier, Italia di Navigaziona ("Italia") in Genoa on December 12, 1985, listing Crowe as the shipper and Lep as the cosignee. In a section marked "applicable only when the document is used as combined transport bill of lading," the bill lists Genoa as the place of acceptance and Chicago as the place of delivery and designates the type of move as "house to house." From its face, then, this bill appears to "contemplate[ ] the use of other carriers to effect inland transportation," *see Tokio,* 717 F.Supp. at 1309, and to refer, at least indirectly, to "through" transportation. *See Austracan (U.S.A.) Inc. v. Neptune Orient Lines,* 612 F.Supp. 578 (S.D.N.Y.1985).

The bill of lading further indicates that ocean freight between Genoa and Norfolk had been paid but that freight for inland transportation remained due, indicating that Italia was to arrange for and compensate the domestic transporter; indeed, Johannes Arlinghaus states in his affidavit that Containership Agency, the United States agent for Italia, sent Lep a freight invoice for transportation of the machine between Norfolk, Virginia, the U.S. port of entry, and Chicago, the final destination, and arranged for Cordin Motor Freight to

deliver the machine to Chicago (Lep also submits this invoice as an exhibit). Given these facts, which Capitol neither contests nor supplements, we have no trouble concluding that the folder-gluer machine was shipped from Genoa to Chicago under a through bill of lading and, accordingly, that the Carmack Amendment does not apply to this dispute.

### 2. *Limitation of Liability to $150*

■ Along with its answer to Capitol's original complaint, Lep asserted three affirmative defenses. We granted Capitol's motion for partial summary judgment with respect to one of these defenses, which sought to limit damages to the value declared for customs purposes, in our October 11 Memorandum and Order. In the same opinion, however, we denied Capitol's motion for summary judgment on Lep's alternative assertion that liability under the allegedly breached contract is limited to $150 in light of a provision on the back of Lep's invoices, reasoning that material issues of fact remained as to whether a course of dealing existed between Capitol and Lep that would, pursuant to § 1–205 of the Illinois Commercial Code, allow the limitation-of-liability term to supplement the contract at issue. In the motion now before this court, Lep seeks summary judgment on this defense, which it apparently reasserts with respect to count II of Capitol's amended complaint.

As we stated in our earlier decision, the existence of a course of dealing for the purposes of § 1–205, defined as "a sequence of previous conduct between the parties ... which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct," Ill.Rev.Stat. ch. 26, § 1–205 (1987), is a question of fact. *See Gord Industrial Plastics v. Aubrey Mfg.*, 103 Ill.App.3d 380, 59 Ill.Dec. 160, 431 N.E.2d 445 (2d Dist.1982). In support of its motion, Lep offers the affidavit of Adrienne Graddy, Arlinghaus's assistant in Lep's Chicago branch, in which she states that Capitol and Lep, in the course of a relationship dating back to at least 1977, have engaged in "hundreds of transac-

tions." Each of these transactions, according to Arlinghaus, involved invoices containing the same "terms and conditions" as the invoice sent under the present contract, including term and condition # 5, which limits liability to $50 per package.

Under § 1–205(3), a course of dealing between parties "give[s] particular meaning to and supplement[s] or qualif[ies] terms of an agreement." Conceding that this language permits the incorporation, by reference to a course of dealing, of a "gap-filling" term into a contract, Capitol, relying on *Latex Glove Co. v. Gruen*, 146 Ill.App.3d 868, 100 Ill.Dec. 488, 497 N.E.2d 466 (1st Dist.1986), argues that § 1–205 does not countenance the addition of "an entirely new or separate obligation to an otherwise unambiguous contract" (plaintiff's brief at 3). The contract in *Latex Glove* on its face obligated defendant Gruen, a printer, to produce a catalog; Latex Glove asserted that trade usage required additionally that Gruen supply the byproducts of this catalog production process upon Latex Glove's request. The Illinois Appellate Court refused to incorporate this term into the agreement, reasoning that trade usage could be used to fill gaps in a contract but could not create "a new obligation for separate goods." 146 Ill. App.3d at 875, 100 Ill.Dec. at 492, 497 N.E.2d at 470.

■ Unlike the asserted trade usage at issue in *Latex Glove*, the additional term that Lep insists was part of the agreement in this case grew out of an alleged course of dealing between the parties. Capitol has not cited, nor has this court's research uncovered, any case that extends *Latex Glove*'s "gap-filler" principle to the course-of-dealing context. And although the Illinois Commercial Code seems to treat course of dealing and usage of trade similarly when it provides that each "give[s] particular meaning to and supplement[s] or qualif[ies] terms of an agreement," § 1–205(3), it also clearly establishes that course of dealing should be accorded more weight in contract construction:

The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and *course of dealing controls usage of trade.*

§ 1–205(4) (emphasis added); *see also Nanakuli Paving & Rock Co. v. Shell Oil Co.,* 664 F.2d 772, 795 (9th Cir.1981) ("Course of dealings is more important than usages of the trade, being specific usages between the two parties to the contract."). To the extent that the course of dealing between parties is thought to reflect more accurately their agreement, then, courts should be more willing to incorporate terms based on such dealings than terms drawing on the less favored concept of trade usage.

Even disregarding this distinction between course of dealing and usage of trade, we decline to find § 1–205 inapplicable to this case because we do not believe that *Latex Glove* reflects a proper understanding of § 1–205. Neither the actual commercial code provision nor the accompanying comments suggest that "supplement" is meant to be interpreted so narrowly; indeed, the Restatement of Contracts, commenting on its analogue to § 1–205, notes that course of dealing may

> determine the meaning of language or ... may annex an agreed but unstated term. There is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown, nor is it required that the course of dealing be consistent with the meaning the agreement would have apart from the course of dealing.

*Restatement (Second) of Contracts* § 223 comment b (1981). By contrast, in the section providing for the addition of terms through an acceptance or confirmation, the code explicitly excludes terms that "materially alter" the contract. Ill.Rev.Stat. ch. 26, § 2–207 (1987). The absence of limiting language in § 1–205 is additionally significant in light of the intention of the drafters that the Commercial Code "be liberally construed and applied to promote its underly-ing purposes and policies"; one of these "purposes and policies" is "to permit the continued expansion of commercial practices through custom, usage and agreement of the parties." Ill.Rev.Stat. ch. 26, § 1–102(1), (2)(b) (1987).

■ Nor do other decisions applying § 1–205 support *Latex Glove*'s reading of this provision. *See, e.g., Barry Gilberg, Ltd. v. Craftex Corp.,* 665 F.Supp. 585, 591 (N.D.Ill.1987) ("Where no stipulation to the contrary is included in a parties' contract, the customs and usages of the trade are presumed to form a part of the contract, provided the same are known to the parties or provided the parties are chargeable with knowledge thereof."); *Nanakuli,* 664 F.2d at 795 ("only if [performance, usages, and prior dealings] cannot be reasonably reconciled with the express terms of the contract are they not binding on the parties"). That the Code contemplates a more expansive role for course of dealing and trade usage is bolstered by its definition of "agreement," which it understands to comprise "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade." Ill.Rev.Stat. ch. 26, § 1–201(3) (1987). This broad definition suggests that course of dealing is an integral part of a commercial agreement from its very inception and is not intended merely to fill gaps that later might appear. *See also Clark v. General Foods Corp.,* 81 Ill.App.3d 74, 78, 36 Ill.Dec. 447, 451, 400 N.E.2d 1027, 1031 (3d Dist.1980) (quoting *Kelly v. Carroll,* 223 Ill.App. 309, 315–16 (1st Dist.1921) ("'When existence of the custom has been proved, it has the force of law within the sphere where established and enters into the contracts of those within that sphere who have knowledge of its existence.'")). This more expansive understanding is also consistent with the rationale underlying § 1–205—"'that the parties in making the contract had such custom in their minds and stipulated with reference to it, thereby making it a part of their contract.'" *Id.*

Section 1–205(1) establishes that previous conduct between parties becomes a "course

of dealing" only if it is "fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Both Capitol and Lep agree that a business practice will constitute a "common basis of understanding" only if the parties are or should be aware of it; they diverge, however, over whether Capitol can be charged with such knowledge in this case. In arguing that it was not aware of the "terms and conditions" on the back of Lep's invoices, Capitol submits the affidavit of Norman Singer, the president of Capitol Converting Equipment, in which he states that neither he nor any other employee of Capitol ever read or was aware of the terms on the back of Lep's invoices. While this statement certainly disputes a claim that Capitol was *actually* aware of Lep's limitation-of-liability provision, it does not speak to the issue of constructive knowledge. The limitation-of-liability term appeared, according to Lep's affidavits, on the back of hundreds of invoices over twelve years. The print was not excessively small nor were the terms and conditions unduly voluminous. Even giving full credit to Norman Singer's statement, we find that Lep's uncontested evidence of the multiple transactions involving the same term establishes that Capitol should have been aware of this term.

■ Capitol attempts to manufacture a disputed issue of material fact by questioning exactly how many transactions occurred between it and Lep and pointing to a discrepancy between Lep's 12(1) statement (based on Adrienne Graddy's affidavit), which states that the two parties have engaged in business dealings together since 1977, and Lep's memorandum, which asserts that the business relationship dates back twenty years. That we do not know with certainty how many invoices were sent to Capitol, however, is not relevant as long as enough were sent to establish a course of dealing. Capitol does not challenge Graddy's sworn statement that hundreds of deals transpired between the two parties, and this figure, understood in its most conservative light, certainly constitutes a sequence of previous conduct sufficient to rise to the level of course of dealing. Our conclusion that a course of dealing exists between the parties would be the same whether the parties had been conducting business for twenty years or for twelve, and we do not find this minor inconsistency to cast doubt upon the accuracy of Graddy's affidavit.

Finally, Capitol objects to the manner in which the limitation-of-liability term was proposed, questioning when this term, which has always appeared on the back of invoices, "magically bec[a]me a part of the parties' mutual understanding" (plaintiff's brief at 4). We agree with Capitol that this issue—when a sequence of business transactions becomes a course of dealing—is conceptually perplexing and can be difficult in practice in borderline cases where the parties have only recently entered a business relationship. Luckily this dispute does not present one of those difficult situations: the relationship here is longstanding and the sequence of transactions well established. For purposes of this motion, we need not determine when the course of dealing began but rather whether it existed when the parties entered into the folder-gluer machine contract. Section 1–205 and its underlying principle of contract interpretation have frequently been invoked to add to a contract a term that has appeared only on invoices issued after an agreement is reached. *See Schulze and Burch Biscuit Co. v. Tree Top, Inc.,* 831 F.2d 709, 715 (7th Cir.1987); *Aer Lingus v. Dart Orient Services,* 658 F.Supp. 3, 5 (S.D.N.Y. 1986); *Consolidated International Corp. v. S.S. Falcon,* 1983 A.M.C. 270 (S.D.N.Y. 1982).

The issue of assumption of risk arises frequently in almost every business context, and a number of options are available to business people to assign risk and to insure against loss. Capitol, which had received hundreds of invoices from Lep with the limitation term before entering into the contract at issue and should have been amply aware of this condition, needed only to bargain for an alternative term and, pursuant to § 1–205(4), that term would have superseded the established course of dealing. We therefore conclude that Capi-

tol is bound by the limitation-of-liability term appearing on the back of the invoice corresponding to this transaction.

## CONCLUSION

For the foregoing reasons, Lep's motion for summary judgment with respect to count I of Capitol's amended complaint is granted. We also grant Lep's motion for summary judgment with respect to its defense, limiting liability to $150.