717 So.2d 507 (1998)
KING OCEAN CENTRAL AMERICA, S.A., Petitioner,
v.
PRECISION CUTTING SERVICES, INC., Respondent.
No. 91033.
Supreme Court of Florida.
June 12, 1998.
Rehearing Denied September 10, 1998.
*508 Richard B. Austin, and Gerhardt A. Schreiber, Miami, for Petitioner.
James C. Blecke of Deutsch & Blumberg, P.A., Miami, and Rex B. Guthrie, Miami, for Respondent.
ANSTEAD, Justice.
We have for review the decision in Precision Cutting Services, Inc. v. King Ocean Central America, S.A., 696 So.2d 824 (Fla. 3d DCA 1997). We accepted jurisdiction to answer the following question certified to be of great public importance:
WHERE AN OCEAN CARRIER ISSUES A THROUGH BILL OF LADING WHICH INCLUDES INLAND TRANSPORTATION IN THE UNITED STATES BY MOTOR CARRIER, AND WHICH PROVIDES THAT THE OCEAN CARRIER WILL BE VICARIOUSLY LIABLE FOR ANY LOSS WHILE THE GOODS ARE IN THE CUSTODY OF THE INLAND MOTOR CARRIER, AND THE GOODS ARE LOST WHILE IN THE CUSTODY OF THE INLAND MOTOR CARRIER WHO HAS ISSUED A SEPARATE BILL OF LADING, IS THE OCEAN CARRIER *509 AS A MATTER OF LAW SUBJECT TO THE CARMACK AMENDMENT AND THE CARMACK TWO-YEAR STATUTE OF LIMITATIONS FOR THE INLAND LEG OF THE JOURNEY, OR IS THE OCEAN CARRIER'S LIABILITY GOVERNED BY THE CARRIAGE OF GOODS BY SEA ACT (COGSA), THE TERMS OF THE BILL OF LADING, AND THE COGSA ONE-YEAR STATUTE OF LIMITATIONS?
Id. at 829. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. For the reasons expressed below, we quash the Third District's decision and hold that the ocean carrier's liability is governed by the Carriage of Goods by Sea Act (COGSA), the specific provisions of the parties' through bill of lading, and the one-year statute of limitations found in COGSA and the bill of lading.

MATERIAL FACTS[1]
King Ocean Central America, S.A. (King Ocean), contracted with Precision Cutting Services, Inc. (Precision), in May 1993 to transport Precision's goods[2] from Costa Rica in Central America to Miami, and then overland from Miami to Little Rock, Arkansas via motor carrier. In its through bill of lading, King Ocean agreed to be vicariously liable for any loss or damage to Precision's goods while they were in the custody of the inland carrier, Paradise Freightway, Inc. A specific provision in the King Ocean-Precision bill of lading required any claims to be filed against King Ocean within one year. A separate bill of lading covered the inland portion of the transport by Paradise. Precision's goods were then allegedly stolen during the inland portion while the goods were at Paradise's Miami freightyard.
Over a year later, Precision filed an action against King Ocean to recover damages for the stolen goods. The trial court entered summary judgment in favor of King Ocean after finding that the suit was barred by the one-year statute of limitations in the Carriage of Goods by Sea Act, 46 U.S.C.App. § 1303(6) (1992), better known as COGSA, which was expressly incorporated into the parties' contract. On appeal to the Third District, Precision argued that a separate federal law, referred to as the Carmack Amendment, 49 U.S.C. § 11707 (1992), rather than COGSA, was controlling, and therefore the one-year statute of limitations was inapplicable. The Third District agreed with Precision based on its earlier opinion in Harvest International, Inc. v. Tropical Shipping & Construction Co., 644 So.2d 112 (Fla. 3d DCA 1994). The majority opinion reasoned that, as in Harvest International, because the domestic inland portion of the transport from a foreign country was covered by a separate bill of lading, the Carmack Amendment was applicable and therefore the trial court erred in granting summary judgment based on COGSA's one-year statute of limitations. Precision Cutting Services, Inc., 696 So.2d at 825-26. Judge Cope disagreed with the majority's result and reasoning, arguing that Harvest International was "wrongly decided." However, he concurred because Harvest International remains binding precedent in the Third District. Id., 696 So.2d at 826 (Cope, J., specially concurring).

LAW AND ANALYSIS
As noted in the district court's opinions and by the parties in their briefs, the issue presented is not one of liability. There is no dispute that King Ocean expressly voluntarily subjected itself by contract to vicarious liability for any loss or damage done to Precision's goods while they were in the custody of the inland carrier, Paradise Freightway, Inc. Precision Cutting Services, Inc., 696 So.2d at 825; Precision Cutting Services, Inc., 696 So.2d at 829 n. 5 (Cope, J., specially concurring). Rather, the issue raised in the certified question is the applicable law and its corresponding statute of limitations as well as the effect of the one-year limitation provision set out in the parties' contract.

BILLS OF LADING
Precision and King Ocean entered into an agreement for the shipment of Precision's *510 goods by King Ocean by executing a through bill of lading. A bill of lading is a "document evidencing the receipt of goods for shipment issued by a person engaged in the business of transporting or forwarding goods." See UCC § 1-201(6) (1995). The value of a bill of lading is found in the multiple roles that it plays: first, it is the best evidence of the contract of carriage between the carrier and the seller; second, it serves as the receipt for the goods under transport; and third, it is a document of title to property which can be endorsed and negotiated. See William Tetley, Marine Cargo Claims (3d ed.1988).
A "through bill of lading" may be thought of as a bill of lading with "long legs." It is designed "for the carriage of goods from one place to another by several shipowners or railway companies." Sir Thomas Edward Scrutton, Charterparties and Bills of Lading 72 (9th ed.1919). The through bill of lading emerged as international trade developed in the latter half of the nineteenth century, especially between the United States and Europe. See generally Thomas Gilbert Carver, Carriage of Goods by Sea (6th ed.1918). As to its legal import, Carver wrote that:
When a contract for a through journey is made with a carrier or contractor, he is answerable for its complete performance, although it may be intended that some part of the carrying shall be done by others, unless the contract expressly limits his liability to his own part of the journey.
Apart, then, from such a limitation, the first carrier with whom the contract is made may be liable for a breach of it after the goods have left his hands. But the carrier in whose hands they were when the breach was committed is also generally liable, if the through contract was made for his benefit, and with his authority; and, on the other hand, he is entitled to the benefit of the exceptions of liability which the contract may contain.
Id. at 162 (citations omitted). Put another way,
[a] pure through bill of lading is a contract whereby the first carrier contracts to carry from point `A' to point `B' and on to final destination `C[.]' The goods are received and the first carrier carries to point `B' and a second carrier carries to point `C[.]' There even may be intermediate carriers, but in every case the claimant may call upon the first carrier for any loss along the route whether or not the loss took place in the first carrier's hands.
William Tetley, Marine Cargo Claims 253 (1965). More recently, the Seventh Circuit Court of Appeals has defined a through bill of lading as one "issued in a foreign country to govern a shipment throughout its transportation from abroad to its final destination in the United States." Capitol Converting Equip., Inc. v. LEP Transp., Inc., 965 F.2d 391, 394 (7th Cir.1992).

COGSA
In 1936 Congress adopted the Carriage of Goods by Sea Act (COGSA). Ch. 229, § 3, 49 Stat. 1208 (1936) (codified at 46 U.S.C. app. §§ 1300-1315). COGSA was the domestic enactment of the 1924 International Convention for the Unification of Certain Rules of Law Relating to Bills of Lading, better known as the Hague Rules. Michael F. Sturley, Proposed Amendments to the Carriage of Goods by Sea Act, 18 Hous. J. Int'l L. 609, 610 (1996). The Hague Rules and COGSA were intended to bring more balance to the merchant/shipper-carrier relationship and overcome some of the overly advantageous contract clauses in the bills of lading, which were traditionally drafted by the carriers. See Tessler Brothers (B.C.) Ltd. v. Italpacific Line, 494 F.2d 438, 444 (9th Cir.1974) (footnote and citation omitted) (recognizing that Congress passed COGSA and its predecessor statute "to counteract the persistent efforts of carriers, who are the drafters of ocean bills of lading, to insert all embracing exceptions to liability"). Indeed, the legislative history of COGSA reveals that one of its specific purposes was "to obviate the necessity for a shipper to make a detailed study of the fine print clauses of a carrier's regular bill of lading on each occasion before shipping a package." Id. at 445.[3]
*511 Nevertheless, certain COGSA provisions, especially section 1303(6) (one-year statute of limitations for bringing a civil suit, beginning with the date the goods were delivered or should have been delivered), and section 1304(5) (limiting the carrier's and the ship's liability to no more than $500 per package or customary freight unit), clearly benefit carriers.[4]

CARMACK AMENDMENT
On the other hand, the Carmack Amendment to the Interstate Commerce Act was passed by Congress in 1906; Ch. 3591, § 7, 34 Stat. 595 (1906); and governs the liability of U.S. inland common carriers for lost or damaged goods. Rini v. United Van Lines, Inc., 104 F.3d 502, 503 (1st Cir.1997). As the First Circuit recently reiterated:
[T]he principal purpose of the Amendment was to achieve national uniformity in the liability assigned to carriers. It is evident that Congress intended to adopt a uniform rule and relieve such contracts from the diverse regulation to which they had been theretofore subject.... The importance of uniformity has frequently been stressed in subsequent Supreme Court decisions.
Id. at 504 (internal quotations and citations omitted). As repeatedly reaffirmed by the United States Supreme Court, the purpose of the amendment was to "relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." Reider v. Thompson, 339 U.S. 113, 119, 70 S.Ct. 499, 94 L.Ed. 698 (1950); Missouri, Kansas, & Texas R. Co. v. Ward, 244 U.S. 383, 386, 37 S.Ct. 617, 61 L.Ed. 1213 (1917) (amendment's purpose was "to create in the initial carrier unity of responsibility for the transportation to destination"); Atlantic Coast Line R. Co. v. Riverside Mills, 219 U.S. 186, 203, 31 S.Ct. 164, 55 L.Ed. 167 (1911) (amendment's purpose "is adapted to secure the rights of the shipper by securing unity of transportation with unity of responsibility... [and] also facilitates the remedy of one who sustains a loss, by localizing the responsible carrier").
Indeed, the Carmack Amendment imposes a form of strict liability on domestic common carriers. 49 U.S.C. § 11707(a)(1) (applicable carriers "are liable to the person entitled to recover under the receipt or bill of lading" and "[f]ailure to issue a receipt or bill of lading does not affect the liability of a carrier or freight forwarder"). As one commentator has written, the amendment codified the *512 common law liability rule "that a common carrier is liable without proof of negligence for loss or damage to cargo unless it can establish one of the common law defenses, i.e., act of God, enemies of the King, inherent vice of the goods, etc." Saul Sorkin, Limited Liability in Multimodal Transport and the Effect of Deregulation, 13 Till. Mar. L.J. 285, 291 (1989).

FEDERAL CASELAW
In Harvest International, the Third District held that an ocean carrier was liable under the Carmack Amendment for damage to a shipper's goods during the inland portion of the transport, because a second, separate bill of lading was issued for the inland portion of the transport. 644 So.2d at 113. The Harvest International court relied on the Seventh Circuit's opinion in Capitol Converting Equip., Inc. v. LEP Transp., Inc., 965 F.2d 391 (7th Cir.1992), and the Eleventh Circuit's opinion in Swift Textiles, Inc. v. Watkins Motor Lines, Inc., 799 F.2d 697 (11th Cir.1986). Although concurring specially, Judge Cope contended that these federal decisions were misconstrued in the Harvest International opinion, and they actually provide no support for applying the Carmack Amendment to an ocean carrier:
In sum, the cases relied on by Harvest International were examining the Carmack Amendment coverage of United States defendants. The through bill of lading issued by the ocean carrier was relevant in order to determine whether the shipment carried within the United States was a continuation of foreign commerce. Neither federal case held that an ocean carrier is covered by the Carmack Amendment.
Id., 696 So.2d at 828. After reviewing the majority opinion and Judge Cope's special concurrence, we agree with Judge Cope's analysis and adopt it as our own.
We concur in Judge Cope's view that neither Swift Textiles nor Capitol Converting supports the conclusion that an ocean carrier is covered by the Carmack Amendment simply because a through bill of lading is entered into by the ocean carrier, and a separate bill of lading is subsequently issued by the inland carrier. As Judge Cope pointed out, the ocean carriers in those cases were not parties to the dispute, Precision Cutting Services, Inc., 696 So.2d at 827-28, and, indeed, the carrier in Swift Textiles was not even identified in the opinion. Those cases concerned the liability of the inland carriers. The liability of the ocean carriers was not at issue in those disputes.
Specifically, the language quoted in Capitol Converting, Harvest International, and the majority opinion below is based on the holding in Swift Textiles that "when a shipment of foreign goods is sent to the United States with the intention that it come to final rest at a specific destination beyond its port of discharge, then the domestic leg of the journey (from the port of discharge to the intended destination) will be subject to the Carmack Amendment as long as the domestic leg is covered by separate bill or bills of lading." 799 F.2d at 701. The legal reasoning behind that holding remains valid, that inland carriers are subject to Carmack Amendment liability when a separate, domestic bill of lading is issued, even though a through bill of lading was issued abroad covering the same transport. However, no language in any of the cited federal opinions indicates an intended application of that rule to an ocean carrier, such as King Ocean. Moreover, we believe that an examination of the plain language of the parties' contract here, as well as the Carmack Amendment, leads to the same conclusion.

STATUTORY INTERPRETATION
In the Carmack Amendment's opening sentence, Congress limited its coverage to "common carrier[s] providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under subchapter I, II, or IV of chapter 105 of this title and ... freight forwarder[s,]" 49 U.S.C. § 11707(a)(1) (1992), thus excluding those carriers covered under subchapter III, water carriers. Only "[t]hat carrier or freight forwarder and any other common carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Commission ... are liable to the person entitled to recover under the receipt *513 or bill of lading." Id. Further, a civil action may be brought under the amendment only against the originating rail carrier, the delivering rail carrier, and the carrier alleged to have caused the loss or damage. Id. § 11707(d)(2)(A)(i)-(iii).
Therefore, by its own terms, the Carmack Amendment appears to apply only to inland carriers subject to the jurisdiction of the Interstate Commerce Commission. See Swift Textiles, 799 F.2d at 699 (recognizing that Carmack Amendment "applies when the ICC has jurisdiction over the shipment in question"). Indeed, the amendment even explicitly excludes "domestic"[5] water carriers from its coverage in subsection (c)(2):
If loss or injury to property occurs while it is in the custody of a water carrier, the liability of that carrier is determined by its bill of lading and the law applicable to water transportation. The liability of the initial or delivering carrier is the same as the liability of the water carrier.[6]
Therefore, we agree with Judge Cope's conclusion that an ocean carrier's liability was not contemplated or covered under the Carmack Amendment. Precision Cutting Services, Inc., 696 So.2d at 829 (Cope, J., specially concurring).

CONTRACT INTERPRETATION
We also find that the plain language in the parties' bill of lading leaves no doubt that the parties intended that the one-year limitation period of COGSA would control the agreement. In its "Clause Paramount," the contract's preamble provides that "[t]his Bill of Lading shall have effect subject to the provisions of the `Carriage of Goods by Sea Act 1936' (COGSA)." More importantly, the plain language of paragraph 7 of the bill of lading, titled "NOTICE OF LOSS, TIME BAR," expressly supports this conclusion:
Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the Carrier [King Ocean] or his agents at the port of discharge or the place of delivery as the case may be before or at the time of removal of the goods into the custody of the merchant[,] such removal shall be prima facie evidence of the delivery by the Carrier of the Goods as described in this Bill of Lading. If the loss or damage is not apparent, then notice must be given within three days of the delivery. In any event, the Carrier shall be discharged from any liability unless suit is brought within one year after delivery of the Goods or the date when the Goods should have been delivered. Suit shall not be deemed brought until jurisdiction shall have been obtained over the Carrier and/or the ship by service of process.
(Emphasis supplied). In the final analysis, King Ocean simply agreed, by contract, to be vicariously liable for any loss or damage to Precision's goods even after they left King Ocean's possession and while they were in the custody of the inland carrier but contractually limited its liability to the one-year term provided in COGSA. Without that provision accepting responsibility in the through bill of lading, Precision's only recourse would be to pursue a statutory remedy against the inland carrier under the separate bill of lading and the Carmack Amendment. This is really no different than the situation in Swift Textiles, where the Eleventh Circuit held that the owner of the goods had a statutory remedy under the Carmack Amendment against the inland carrier for damages incurred while the goods were in the inland carrier's custody. 799 F.2d at 701. The contracting parties here clearly contemplated and agreed that if loss or damage occurred during the mainland journey, the ocean carrier would be liable, but "the Carrier [King Ocean] shall be discharged from any liability unless suit is brought within one year after delivery of the Goods or the date when the Goods should have been delivered." These provisions speak for themselves. We find nothing within these provisions subjecting King Ocean to liability under the Carmack Amendment.
*514 Hence, we conclude that the opinion in Harvest International was in error and predicated upon a misreading of the federal case law. While a colorable argument could be made that the paragraph in the bill of lading subjecting King Ocean to vicarious liability for the domestic carrier's actions, paragraph 4.(1), is ambiguous as to the applicable law and should therefore be construed against its drafter, King Ocean, we reject that notion for several reasons.[7] First, COGSA is cited throughout the bill of lading as the controlling law, while the Carmack Amendment is never mentioned. Second, paragraph 7 of the contract expressly and unambiguously provides that "[i]n any event, the Carrier shall be discharged from any liability unless suit is brought within one year after delivery of the Goods or the date when the Goods should have been delivered." Clearly, by this unambiguous provision, King Ocean was expressly invoking COGSA's one year statute of limitations to any liability it may have to the shipper. There is no reasonable interpretation of the parties' bill of lading to the contrary or that would yield a conclusion that the parties contemplated a sliding statute of limitations based on when and where any damage or loss occurred.

CONCLUSION
In its simplest form, the parties' agreement was that in the event of any loss or damage throughout the entire journey, King Ocean would assume responsibility subject to liability limitations granted it under COGSA. Therefore, Precision was relieved of the burden of possibly suing multiple parties or proving when and where the loss occurred because King Ocean assumed "unity of responsibility for the transportation to destination." Ward, 244 U.S. at 386, 37 S.Ct. 617. King Ocean was the only party that Precision would have to either file a claim with or suit against to recover any losses or damages. However, the contract just as clearly provided that an action against King Ocean must be brought within COGSA's one-year statute of limitations.[8]
Accordingly, we quash the decision under review and approve and adopt Judge Cope's special concurring opinion and disapprove Harvest International for the reasons expressed above.
It is so ordered.
KOGAN, C.J., OVERTON, SHAW, HARDING and WELLS, JJ., and GRIMES, Senior Justice, concur.
NOTES
[1] The following facts are from the district court's opinion. Precision Cutting Services, Inc., 696 So.2d at 825.
[2] The shipment consisted of 990 cartons of finished Levi's Dockers slacks.
[3] A review of COGSA's legislative history confirms that observation. Specifically, the House of Representatives report found that "[t]he uniformity and simplification of bills of lading will be of immense value to shippers who will be relieved of the necessity of closely examining all bills of lading to determine the exceptions contained therein to ascertain their rights and responsibilities; to underwriters who insure the cargo and are met with the same difficulties; and to bankers who extend credit upon the bills of lading." H. Rep. No. 2218, 74th Cong., 2d Sess. 7 (1936).

Both houses of Congress recognized the broad support for COGSA from all the concerned interests, including shippers, carriers, bankers, and marine underwriters. H. Rep. No. 2218 at 1-3 (characterizing support as "universal demand" for the legislation); S.Rep. No. 752 at 3.
[4] COGSA is ambiguous as to whether independent contractors, such as stevedores, are similarly cloaked with its liability limitations. After the United States Supreme Court ruled that a defendant stevedore could not receive the benefit of the carrier's $500 unit limitation in Robert C. Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959), carriers began inserting specific clauses in their bills of lading to extend protection to their employees, agents, and independent contractors, such as the stevedore in Herd. In the English case that gave those clauses their name, Adler v. Dickson, 1 Q.B. 158 (C.A.1954), a passenger injured on the steamship "Himalaya," Mrs. Adler, sued the master and boatswain in tort because she could not sue the carrier, which was contractually exempt from all liability. The master and the boatswain did not receive the benefit of the carrier's liability exemption because the contract between Mrs. Adler and the company did not have a clause extending the exemption to them. Thus, Mrs. Adler won her case.

Consequently, so-called Himalaya clauses are now a standard feature in most carriers' bills of lading. A model clause provides that: "All defenses [of the Carrier] shall inure also to the benefit of the Carrier's agents, servants and employees and of any independent contractor performing any of the Carrier's obligations under the contract of carriage or acting as bailee of the goods, whether sued in contract or tort." Michael F. Sturley, An Overview of the Considerations Involved in Handling the Cargo Case, 21 Tul. Mar. L.J. 263, 353 (1997) (quoting Secrest Machine Corp. v. S.S. Tiber, 450 F.2d 285, 286 (5th Cir.1971)) (hereinafter Overview). In this case, a Himalaya clause is incorporated into paragraph 3.(2) of King Ocean's bill of lading.
[5] That is, a carrier transporting goods from one state or United States territory or possession to another.
[6] Interestingly, most domestic carriers apparently employ COGSA as the governing law in their bills of lading. Overview, 21 Tul. Mar. L.J. at 284.
[7] Paragraph 4.(1) provides:

If it can be proved that the loss or damage occurred while the Goods were in the custody of an inland carrier the liability of the Carrier and the limitation thereof shall be determined in accordance with the inland carrier's contracts of carriage and tariffs, or in the absence of such contracts or tariffs, in accordance with the international law of the state where the loss or damage occurred.
[8] While COGSA's scope is limited to international sea-going commerce to and from the United States, COGSA also provides, under the so-called "coastwise option," that "[a]ny bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea between such [domestic] ports, containing an express statement that it shall be subject to the provisions of this chapter, shall be subjected hereto as fully as if subject hereto by the express provisions of this chapter." 46 U.S.C.App. § 1312 (1992). One observer points out that "[i]n practice, carriers regularly take advantage of this option when drafting their bills of lading; accordingly most domestic shipments by sea are governed by COGSA." Overview, 21 Tul. Mar. L.J. at 284; see, e.g., Pan Am. World Airways, Inc. v. California Stevedore & Ballast Co., 559 F.2d 1173, 1175 n. 3 (9th Cir.1977). Therefore, if Congress intended that COGSA's liability defenses be extended to interstate shipments via the sea lanes, it is reasonable to conclude that those same defenses attach when an ocean carrier assumes vicarious responsibility for what is undisputably a continuation of international commerce. As mentioned above, King Ocean included the express statement in its Clause Paramount that "[t]his Bill of Lading shall have effect subject to the provisions of the `Carriage of Goods by Sea Act 1936' (COGSA)."